# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

No. 04-6035 WM

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| David M. Austin, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Donald E. Waring, | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| Plaintiff - Appellee, | * | Western District of Missouri |
| | * | |
| v. | * | |
| | * | |
| David M. Austin, | * | |
| | * | |
| Defendant - Appellant. | * | |

Submitted: November 10, 2004
Filed: November 29, 2004

Before KRESSEL, Chief Judge, SCHERMER and MAHONEY, Bankruptcy
Judges

SCHERMER, Bankruptcy Judge

David M. Austin ("Debtor") appeals the bankruptcy court's order and judgment excepting from discharge his obligation to Donald E. Waring ("Creditor") pursuant to 11 U.S.C. § 523(a)(2)(A). We have jurisdiction over this appeal from the final

order of the bankruptcy court. *See* 28 U.S.C. § 158(b). For the reasons set forth below, we reverse.

## ISSUES

The issues raised by the Debtor are whether the court erred in finding that the Debtor made a false representation to the Creditor, that the Debtor intended to deceive the Creditor, and that the Creditor justifiably relied on the false representation. We conclude that the bankruptcy court did err in finding that the Creditor justifiably relied on the Debtor's false representation. This sole error mandates reversal. Therefore, we need not address the intent to deceive issue.

## BACKGROUND

The Creditor is an information technology specialist employed by an accounting firm in Parsons, Kansas. The Debtor was the president and majority shareholder of J.A. Curran's Fine Jewelry, Inc. ("Corporation"), a corporation which operated a jewelry store in Joplin, Missouri. In early, 2000, the Creditor decided to invest $100,000 in the jewelry store. The Creditor hired Attorney Jeffery Jack to represent him in the negotiation of the investment in the jewelry store. As part of the negotiation process, the Creditor asked the Debtor to disclose all assets of the Corporation and any liens thereon and all liabilities of the Corporation. The Debtor told the Creditor that the Corporation had a loan of at least $362,000 which needed renewal. The loan was with Mercantile Bank. The Debtor told the Creditor that the loan was for the store furniture, fixtures, and remodeling.

On February 4, 2000, the Creditor and the Debtor entered into a stock purchase agreement pursuant to which the Creditor purchased 125 shares of the Corporation's stock. Attorney Jack drafted the stock purchase agreement. The agreement refers to an Exhibit A which is supposed to list all corporate assets and all liens or

2

encumbrances thereon and an Exhibit B which is supposed to list all corporate liabilities. No Exhibit A or B was ever provided by the Debtor. The Creditor purchased the stock without Exhibit A or B. The stock purchase agreement obligated the Debtor to repurchase the Creditor's stock under certain circumstances for the greater of $100,000 or book value, plus ten percent.

On February 10, 2000, four days after the stock purchase agreement, the Corporation refinanced the $362,000 loan by executing a promissory note and security agreement in favor of Arvest Bank. The promissory note and security agreement was signed by the Debtor in his capacity as the president of the Corporation. Pursuant to the agreement the Corporation granted Arvest Bank a blanket lien on all assets including inventory. In July, 2000, Arvest Bank filed UCC financing statements with the Missouri Secretary of State and with the Jasper County, Missouri recorder's office perfecting its lien in the Corporation's accounts, equipment, intangibles, fixtures, and inventory.

After investing in the Corporation, the Creditor took over accounting practices for the store. He reviewed invoices and bank statements, wrote checks, paid the bills, and maintained the books. During the course of his involvement with the business, the Creditor discovered that the Corporation had been dissolved and learned of prior outstanding debts which had not been divulged to him. He became uncomfortable with certain business practices including check floating and credit card financing. (Trial Transcript p. 24, Appendix p. 60). By April, 2001, the Creditor decided that he wanted to sever his relationship with the Corporation. The Creditor's decision was based on information that had been given to him and that he had acquired by research. (Trans. p. 24, App. p. 60.) The Creditor asked the Debtor to repurchase the stock in accordance with the stock purchase agreement. The Debtor caused the sum of $26,000 to be paid to the Creditor but was unable to provide the Creditor with any additional money for the stock.

On April 18, 2001, the Creditor went to the jewelry store and advised the store manager, James Gilbert, that he wanted to be paid in jewelry for his stock in the Corporation. The Debtor was not present, so Mr. Gilbert called him and asked him to come to the store immediately. When the Debtor arrived, the Debtor, the Creditor, and Mr. Gilbert went into the office and discussed the Creditor's desire to return his stock in the Corporation in exchange for jewelry. The Creditor spoke on his cell phone with his attorney, Mr. Jack, during the meeting. During the course of the conversation, Mr. Gilbert advised the Creditor that Arvest Bank had a lien on the jewelry. Shortly thereafter Mr. Gilbert was asked to leave the meeting and did so. The Creditor and the Debtor agreed that the Creditor would take certain jewelry in exchange for the return of the Creditor's stock in the Corporation. The Creditor left the store with a large bag of jewelry that evening.

The Creditor changed his mind later that evening and decided that the jewelry that he had received was not of sufficient value. The next day the Creditor returned the jewelry to the store where it was placed in the vault. The parties continued to attempt to resolve their differences. On April 28, 2001, the Debtor and the Creditor agreed upon an alternate selection of jewelry to pay the Creditor for the stock in the Corporation. The Creditor left with the agreed-upon jewelry.

The Corporation continued to make payments to Arvest Bank but eventually defaulted on the loan approximately one year after the jewelry-for-stock swap with the Creditor. Arvest Bank sued the Creditor seeking replevin of the jewelry. The Creditor settled with Arvest Bank by transferring jewelry valued at $77,000 plus $25,000 cash to Arvest Bank.

The Debtor filed a bankruptcy petition in 2003. The Creditor filed an adversary proceeding seeking to except from discharge the Debtor's obligation to him in the amount of $102,000 on three theories: as a debt for fraud under Section 523(a)(2) of the Bankruptcy Code; as a debt based on fraud or defalcation

while acting in a fiduciary capacity under Section 532(a)(4) of the Bankruptcy Code, and as a debt for the sale of stock in violation of Kansas securities laws. The court determined that the April 28, 2001, agreement for the transfer of the stock in exchange for the jewelry was a compromise and settlement of the earlier claims arising out of the original stock purchase. Consequently, claims based on the original purchase of the stock or on actions taken by the Debtor prior to the swap did not survive the compromise and settlement.

The court conducted a trial to determine whether the debt arising out of the jewelry-for-stock swap was a non-dischargeable debt for property obtained by false pretenses, a false representation, or actual fraud within the ambit of Section 523(a)(2)(A) of the Bankruptcy Code. The court entered its order and judgment excepting the debt from discharge pursuant to Section 523(a)(2)(A). The Debtor appeals that judgment and order.

## STANDARD OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *First Nat'l Bank of Olathe, Kansas v. Pontow*, 111 F.3d 604, 609 (8th Cir. 1997); *The Merchs. Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999); *Tri-County Credit Union v. Leuang (In re Leuang)*, 211 B.R. 908, 909 (8th Cir. B.A.P. 1997). The determination of whether a requisite element of a claim under Section 523(a)(2)(A) is present is a factual determination which is reviewed for clear error. *Pontow*, 111 F.3d at 609; *Moen*, 238 B.R. at 790. A finding is clearly erroneous when although there is evidence to support the finding, on review of the entire evidence the appellate court is left with the definite and firm conviction that a mistake has been made. *Moen*, 238 B.R. at 790; *Leuang*, 211 B.R. at 909. Due regard is given to the trial judge's opportunity to evaluate the credibility of the witnesses. Fed. R. Bankr. P. 8013; *Moen*, 238 B.R. at 790.

5

## DISCUSSION

Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, a discharge does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. To prevail in a non-dischargeability action under Section 523(a)(2)(A), a creditor must prove by a preponderance of evidence that: (1) the debtor made a false representation; (2) at the time the debtor knew the representation was false; (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained loss and damage as a proximate result of the representation having been made. *Field v. Mans*, 516 U.S. 59 (1995)(justifiable reliance); *Grogan v. Garner*, 498 U.S. 279 (1991)(burden of proof); *Moen*, 238 B.R. at 790(elements of proof under §523(a)(2)(A)). The Debtor challenges the trial court's findings with respect to the first, third, and fourth elements: false representation, intent to deceive, and justifiable reliance.

The Creditor's case centers on the following premise: the Debtor failed to disclose the fact that Arvest Bank had a lien on the jewelry which the Creditor received in exchange for his stock in the Corporation. According to the Creditor; 1) this failure to disclose the lien amounted to a representation that the Debtor knew was false, 2) the Debtor deliberately and intentionally failed to disclose the Arvest Bank lien to deceive the Creditor into accepting the jewelry in exchange for the stock, and 3: the Creditor justifiably relied on the Debtor's failure to disclose the lien in accepting the jewelry and, as a result, ended up having to give Arvest Bank jewelry and cash with a value of $102,000.

The evidence with respect to whether or not the Debtor disclosed the lien is contradictory. The Debtor clearly never provided the Creditor with any written

6

disclosure of the assets, liabilities, and liens and encumbrances of the Corporation. The evidence with respect to an oral disclosure is contradictory. The Debtor testified that he told the Creditor about the Arvest Bank lien on the date the Debtor demanded payment in jewelry. The Creditor testified that the Debtor never told him about the lien. The trial court found the testimony of the Creditor more credible than that of the Debtor on this point. Where the testimony is contradictory, we must give deference to the trial judge's determination of credibility. We find no clear error in the court's finding that the Debtor failed to disclose to the Creditor the lien of Arvest Bank lien.

We disagree with the trial court's finding that the Creditor justifiably relied upon the false representation with respect to the Arvest Bank lien. Mr. Gilbert, the store manager, testified that he told the Creditor about the Arvest Bank lien on the jewelry during the meeting in the office on April 18, 2001. The court found Mr. Gilbert's testimony credible. Therefore, the Creditor was clearly made aware of the lien. The trial court found that the Creditor was justified in ignoring Mr. Gilbert's statement. We disagree. The trial court mistakenly found that the stock-for-jewelry swap occurred two months after the stock purchase. The swap actually took place fourteen months later, in April, 2001, versus February, 2000. The court found the Creditor discounted Mr. Gilbert's testimony because he had received information from the Debtor a mere two months earlier which contradicted Mr. Gilbert's testimony. The court found that the Creditor was justified in relying on information from the corporate president over information from the store manager. This is clearly erroneous.

The Creditor must prove by a preponderance of the evidence that his reliance on the Debtor's misrepresentation regarding the existence of the Arvest Bank lien was justifiable. Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case. *Field v. Mans*, 516 U.S. at 71(citing Restatement (Second) of Torts, §540 (1976)). A person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the

7

falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*.(quoting Restatement (Second) Torts, § 541, Comment *a*.). "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id*. at 71-72(quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)). "The matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in light of his individual case." *Id*. at 72(quoting W. Prosser, Law of Torts § 108, p. 717).

We must look at the Creditor and his experience with the Debtor to determine if he was justified in relying upon the Debtor's silence in light of Mr. Gilbert's statement regarding the lien. The Creditor is an information technology specialist. He had no experience in the jewelry business prior to his investment in the Corporation; however, he had managed the business' books prior to April, 2001, and had paid the Corporation's bills. He was represented by an attorney when he purchased the stock and, through his attorney, had requested information about liens and encumbrances. He never received the exhibits to the stock purchase agreement setting forth the corporation's assets, liabilities, and encumbrances, yet purchased the stock anyway. After purchasing the stock, the Creditor discovered liabilities which the Debtor had not disclosed. This was one of the main reasons the Creditor wanted out of the business. During the course of the April 18, 2001, meeting, the Creditor spoke with his attorney. At the very least, Mr. Gilbert's statement should have served as a warning that the Creditor was being deceived by the Debtor, especially lin light of the Creditor's prior knowledge of corporate liabilities which had not been disclosed by the Debtor. The evidence as a whole leaves us with the firm conviction that the Creditor was not justified in ignoring Mr. Gilbert's statement.

Both the Debtor and Mr. Gilbert testified that on the evening of April 18, 2001, the Creditor stated that he was not worried about the Arvest Bank lien. According to the Debtor, the Creditor said that he was in a first security position and not to worry about it. (Trans. p. 64., App. p. 100.) According to Mr. Gilbert, the Creditor said, "I've talked to my lawyer. I've got it handled. I've got rights on this merchandise." (Trans. p. 74., App. p. 74.) The trial court again found Mr. Gilbert's testimony credible, yet discounted the Creditor's statement as "hectoring over a fact that [he] believed to be untrue." (Opinion, p. 10, App. p. 30.) The Creditor acknowledged the existence of the Arvest Bank lien yet chose to take the jewelry anyway. He cannot now establish that he was justified in relying on the Debtor's failure to disclose such lien.

The Creditor bears the burden of establishing justifiable reliance. The Creditor did not meet this burden and the court erred in finding justifiable reliance. In light of this court's definite and firm conviction that the Creditor did not establish justifiable reliance, we need not address the Debtor's challenge to the court's finding of an intent to deceive.

## CONCLUSION

The court erred in finding justifiable reliance on the part of the Creditor. Accordingly, we REVERSE the judgment and conclude that the Debtor's obligation to the Creditor is not excepted from discharge.

---

9