**In re Ally SAAD, Debtor.**

**Mounir Abdel–Hak, Plaintiff,**

**v.**

**Ally Saad, Defendant.**

**Bankruptcy No. 04–49164.**
**Adversary No. 04–4223.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Dec. 30, 2004.

John R. Bailey, Ypsilanti, MI, for Robert Young, Marsha Young, aka Marsha Grady.

Majed A. Moughni, Dearborn, MI, for Ally Saad.

Robert W. Palmer, Royal Oak, MI, for Mounir Abdel–Hak.

### *TRIAL OPINION DETERMINING DEBT TO BE DISCHARGEABLE*

PHILLIP J. SHEFFERLY,
Bankruptcy Judge.

### *Introduction*

This matter is before the Court upon a complaint filed by Plaintiff, Mounir Abdel–Hak, against Defendant, Ally Saad, to determine the dischargeability of indebtedness. The complaint seeks a determination that there is indebtedness owing by Saad to Abdel–Hak which is non-dischargeable under § 523(a)(2), (4) and (6) of the Bankruptcy Code. The parties stipulated to have the Court determine only the issue of non-dischargeability of any debt owed to Abdel–Hak by Saad and, in the event that a debt was determined to be non-dischargeable, the parties agreed to have the amount of the debt adjudicated by the Wayne County Circuit Court in pending case # 03–304645–CH. Accordingly, on December 16, 2004, the Court tried the issue of whether there is a non-dischargeable debt owing by Saad to Abdel–Hak under § 523(a)(2), (4) and (6) of the Bankruptcy Code. This opinion constitutes the Court's findings of fact and conclusions of law. For the reasons set forth in this opinion, the Court finds that there is not a non-dischargeable debt under any of sections 523(a)(2), (4) or (6) of the Bankruptcy Code and holds that the complaint should be dismissed.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).

## Facts

Abdel–Hak is the owner of a jewelry store in Dearborn. Ally Saad is a licensed real estate agent. In March, 2001, Ally Saad became aware of a property that had been listed for sale on March 12, 2001 located at 12830 Warren Ave., Dearborn, Michigan. The property was a 6,000 square foot, two story convent that had been used by the Convent of Mary Reparatrix, Inc. The property was listed for sale by Century 21 Riverpoint (Joint Exhibit "A") and the realtor was Jeff LeBlanc. The property was listed for sale at $499,000.

When Ally Saad learned about the property, he contacted a number of persons that he thought might be interested in purchasing the property. He went to several of the property's neighbors, one of whom was Abdel–Hak whose jewelry store was across the street from the property. Abdel–Hak was interested in purchasing the property. He had known Ally Saad for a number of years. When Ally Saad contacted him, they made arrangements to view the property. They inspected the property on Friday, March 16, 2001. There were a number of other interested parties who visited the property the same day. LeBlanc testified that he showed the property to a number of parties that day.

After inspecting the property with Ally Saad, Abdel–Hak wished to submit an offer to purchase the property. Abdel–Hak and Ally Saad then discussed the terms of the offer to be submitted. Because the nuns who resided at the property wished to have continuing occupancy, Abdel–Hak suggested that his offer include a provision that permitted the nuns to stay in the property until January, 2002, rent free. On March 16, 2001, Abdel–Hak made an offer to purchase the property (Joint Exhibit "C"). It was prepared by Ally Saad. The offer was for a purchase price of $499,900, which was $900 more than the asking list price. Further, the offer contained a provision allowing the nuns to live on the premises until January, 2002, rent free. The offer was conditioned upon Abdel–Hak being able to secure a commercial mortgage for 70% of the purchase price of the property within 45 days from acceptance of the offer. Abdel–Hak expressed some concern to Ally Saad at that time that Ally Saad be "straight with him" and not "fool around". On cross examination, Abdel–Hak explained that he had heard stories about Ally Saad's "deals". He acknowledged that he believed Ally Saad was "not trustworthy", "dishonest", and had a reputation in the community as being "a crook". Ally Saad agreed to act as Abdel–Hak's agent.

Ally Saad tendered Abdel–Hak's offer on March 16, 2001. Other offers were tendered during or about the same time (Joint Exhibit "R"). After presenting his offer, Ally Saad went back to Abdel–Hak on March 16 and told him that Abdel–Hak needed to provide proof that he was credit worthy and could get approved for a mortgage to meet the condition in Abdel–Hak's offer to purchase. Abdel–Hak assured Ally Saad that he was credit worthy and that he would have a credit report generated promptly to demonstrate his ability to obtain pre-approval for a mortgage. On the following Thursday, March 22, 2001, Northwood Financial Services provided Abdel–Hak with written pre-approval for a mortgage loan for the purchase of the property (Joint Exhibit "D").

Abdel–Hak testified that he contacted Ally Saad on March 22, 2001 to tell him

that he had received the written pre-approval for the mortgage. He also testified that he had made several attempts to contact Ally Saad from Friday, March 16 until Thursday, March 22, 2001, both on his cell phone and at his office phone number, but was unsuccessful in reaching Ally Saad. Because he could not reach Ally Saad by telephone, Abdel–Hak felt that there was "something fishy" going on. So Abdel–Hak directly contacted the seller's agent, LeBlanc. That took place on either Monday, March 19 or Tuesday, March 20, 2001. Abdel–Hak asked LeBlanc if there were any other offers and LeBlanc informed him that he had received other offers but could not tell Abdel–Hak the substance of those offers. LeBlanc suggested that Abdel–Hak contact his own agent, Ally Saad. But Abdel–Hak was still unsuccessful in reaching Ally Saad. Abdel–Hak eventually learned that the seller of the property had accepted another offer to purchase the property.

The offer that was accepted was made by Jason Saad (Joint Exhibit "O"). Ally Saad denied that Jason Saad is a distant relative. However, he admitted that he is an acquaintance who was also employed as a real estate agent at the same office as Ally Saad and shared a secretary with him. Like Abdel–Hak and Ally Saad, Jason Saad visited the property on March 16, 2001 at the same time as several other buyers did. It appears that Jason Saad's offer was accepted on March 20, 2001 by the dating of the seller's acceptance at the bottom of the offer to purchase. According to LeBlanc and Ally Saad, the offer to purchase submitted by Jason Saad was assigned by Jason Saad to his mother, Mariam Saad, and the sale transaction was then closed with Mariam Saad being the purchaser. To reflect the fact that Mariam Saad had taken an assignment of the purchase offer made by Jason Saad, a copy of the purchase offer was re-signed by Mariam Saad prior to or at the closing (Joint Exhibit "J"). The sale of the convent to Mariam Saad was closed on March 28, 2001.

The purchase price offered by Jason Saad and eventually paid by Mariam Saad was $501,000. In contrast to the offer to purchase submitted by Abdel–Hak, this offer was a cash offer that was not contingent upon financing. However, like the Abdel–Hak offer, Jason Saad's offer also contained a provision that allowed the nuns to reside in the premises, rent free, until January 1, 2002.

Abdel–Hak and Ally Saad both testified that Ally Saad was acting as a buyer's agent for Abdel–Hak in presenting his offer to purchase. However, Abdel–Hak asserts that Ally Saad was also acting as a buyer's agent for Jason Saad and that he presented Jason Saad's offer to LeBlanc in violation of his duties to Abdel–Hak as Abdel–Hak's agent. Further, Abdel–Hak asserts that Ally Saad divulged confidential information contained in the terms of Abdel–Hak's offer to Jason Saad, (i.e., the rent free occupancy provision) such that Jason Saad was able to incorporate some of the terms that Abdel–Hak had included in his offer to purchase.

LeBlanc testified that Ally Saad acted as buyer's agent for both Abdel–Hak and Jason Saad. According to LeBlanc, it is permissible for an agent in Michigan to act as a buyer's agent for more than one buyer so long as this fact is disclosed to the buyers. LeBlanc did not know what Ally Saad had disclosed to Abdel–Hak or Jason Saad. Although he denied that he presented an offer on behalf of Jason Saad, Ally Saad did agree that it is permissible to act for more than one buyer if such fact is disclosed to the buyers. Ally Saad also agreed that to do so without the required disclosure would be in breach of his duties.

LeBlanc testified that among the offers he received for the property were two offers that he understood were presented by Ally Saad. He recalls receiving one of them in person from Ally Saad. He is not quite sure how he received the other one, but believes that he received it within 48 hours of the first one. LeBlanc is not sure whether the offer he received in person from Ally Saad was Abdel–Hak's offer or Jason Saad's offer. LeBlanc distinctly recalls though that Ally Saad was acting as the agent for both buyers, Abdel–Hak and Jason Saad. LeBlanc also remembered that Ally Saad represented Jason Saad at the closing that took place on March 28, 2001.

Ally Saad testified that he did not act as an agent for Jason Saad when he made his offer and that any offer made by Jason Saad was presented by Jason Saad without help from Ally Saad. Ally Saad testified that he was acting solely as the agent for Abdel–Hak until such time as the seller made a decision to accept Jason Saad's offer. From that point forward, Ally Saad admits that he acted as the agent for Jason Saad. According to Ally Saad, however, this was all "after the fact". By that, Ally Saad means that he only began acting as the agent for Jason Saad once the seller of the property had declined the offer submitted by Abdel–Hak and had, instead, accepted the offer submitted by Jason Saad.

Although Ally Saad testified that he did not prepare the offer submitted by Jason Saad, he does acknowledge that his signature appears on that offer. At trial, Ally Saad admitted that his signature appeared on Jason Saad's offer as a witness for the signature of Jason Saad (Joint Exhibit "O") and as a witness for the signature of Mariam Saad when she signed the offer (Joint Exhibit "J"). However, a review of those two documents shows Ally Saad's

signature to also have been placed on the line in the form provided for the "Broker's Acknowledgment of Deposit". In any event, Ally Saad testified that he only signed these documents after the offer submitted by Abdel–Hak had been rejected and the offer of Jason Saad had been accepted. According to Ally Saad, that would have taken place on either March 19 or 20, 2001 and the offer of Jason Saad was then accepted by the seller on March 20, 2001. Ally Saad also testified that he did not help Jason Saad prepare his offer for the property and that any provision in that offer relating to rent free occupancy for the nuns was not the result of Ally Saad divulging confidential information that he gained from Abdel–Hak.

Abdel–Hak testified that had he known of Jason Saad's offer and that it was a cash offer, he would have increased his offer by at least $10,000 and would have made his a cash offer. Abdel–Hak testified that he had the ability to make his offer a cash offer without a financing contingency.

During the time that Jason Saad worked at ReMax with Ally Saad, they had a "working relationship" pursuant to which they would agree to split commissions on certain deals brought by Jason Saad to Ally Saad because Ally Saad had more experience and knowledge. Typically, if a deal was brought by Jason Saad to Ally Saad, Ally Saad would handle it for one-third to one-half of the commission. When the sale of the property at 12830 Warren was closed to Mariam Saad, Jason Saad's mother, they split the buyer's agent's half of the commission with two-thirds of it ($10,020) going to Ally Saad and one-third of it ($5,010) going to Jason Saad. Ally Saad testified that had the purchase offer of Abdel–Hak been accepted, Ally Saad would have had all of the buyer's agent's share and, therefore, a larger commission than he actually received upon the sale to

Mariam Saad. Thus, Ally Saad testified that it would have been in his best interest to have had Abdel–Hak's offer accepted instead of Jason Saad's offer.

After hearing the testimony of Abdel–Hak, Ally Saad and LeBlanc, the Court finds as a fact that Ally Saad acted as a buyer's agent for Abdel–Hak. The Court also finds, based on testimony from Abdel–Hak and LeBlanc, as well as Joint Exhibits "J" and "O", that Ally Saad also acted as a buyer's agent for Jason Saad at the same time. The Court does not find it credible that Ally Saad became Jason Saad's agent only after Jason Saad's offer had been accepted and Abdel–Hak's offer had been rejected. The Court further finds that although Ally Saad acted as the buyer's agent for more than one buyer, Abdel–Hak and Jason Saad, Ally Saad made no written or verbal disclosure of this fact to Abdel–Hak.

According to Abdel–Hak, Ally Saad's conduct in acting for more than one buyer, in failing to disclose to Abdel–Hak that he was submitting an offer on behalf of Jason Saad, and in taking confidential information gained from Abdel–Hak and using it to assist Jason Saad in connection with his offer, caused damage to Abdel–Hak. Although this trial was only for the purpose of determining the existence of a non-dischargeable debt, and not for the purpose of liquidating the amount of such debt, Abdel–Hak asserts that he was damaged by Ally Saad's conduct because the property in question was actually worth considerably more than it was purchased for. Ally Saad testified that after the property was sold for $501,000 to Mariam Saad on March 20, 2001, it was eventually listed for sale by Ally Saad at a higher price, and for lease by Jason Saad, and ultimately sold by Mariam Saad for $700,000 in late 2004. According to Abdel–Hak, had Ally Saad not acted as buy-er's agent for Jason Saad, Abdel–Hak would have been the successful bidder and would have enjoyed the $200,000 profit that was realized by Mariam Saad when she eventually sold the property.

Although the Court finds that Ally Saad did act as a buyer's agent for more than one purchaser, and failed to disclose this fact to Abdel–Hak, the Court does not find from the evidence in the record that Ally Saad disclosed any confidential information to Jason Saad. Further, the Court does not find that Abdel–Hak proved by a preponderance of the evidence that he would have been the successful purchaser of the property but for the conduct of Ally Saad in acting as a buyer's agent for multiple buyers and failing to disclose such fact to Abdel–Hak.

*Analysis*
*11 U.S.C. § 523(a)(2)(A)*

Abdel–Hak's complaint is brought under three sections of 11 U.S.C. § 523(a). The first of those is § 523(a)(2)(A). The Sixth Circuit set forth the following requirements in order for a plaintiff to prevail under § 523(a)(2)(A) in *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir.1998):

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to

discharge are to be strictly construed against the creditor.

141 F.3d at 280–81 (citations and footnote omitted).

■ In this case, Abdel–Hak did not prove that Ally Saad made an overt misrepresentation to him. However, concealment of a material fact can itself constitute a misrepresentation. *See Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr.E.D.Mich.2001) (finding that silence or failure to disclose can be a misrepresentation if there is a duty to disclose) (citation omitted); *Armbrustmacher v. Redburn (In re Redburn)*, 202 B.R. 917, 928 n. 26 (Bankr.W.D.Mich.1996) ("[A] deliberate nondisclosure of a material fact ... is just as culpable as an intentional false affirmation.") (citations omitted). Here, Ally Saad failed to disclose that he was also a buyer's agent for Jason Saad and that he would not be acting solely as Abdel–Hak's agent for the purpose of presenting an offer to purchase. That failure to disclose is a misrepresentation and it is material. The Court further finds that Ally Saad knew that he would be representing more than one buyer and that he intended to deceive Abdel–Hak.

■ However, each of the other required elements of § 523(a)(2)(A), as articulated by *In re Rembert*, were not proven by a preponderance of the evidence in this case. Abdel–Hak himself testified that he considered Ally Saad untrustworthy, dishonest, and a "crook". In view of that fact, it cannot be said that he justifiably relied on the false representation made by Ally Saad concerning Ally Saad's acting solely as the buyer's agent for Abdel–Hak. Further, and more importantly, Abdel–Hak did not prove that his reliance upon any misrepresentation by Ally Saad was the proximate cause of any loss. There is no evidence in the record to demonstrate that, but for Ally Saad's misrepresentation, Abdel–Hak would have been the successful purchaser. The evidence showed that there was a great deal of interest in the property, there were a number of purchase offers that had been made (Joint Exhibit "R"), and that the seller seriously considered each of them. LeBlanc testified without contradiction that Ally Saad had no influence in the process of selection of one of the offers by the seller. In fact, LeBlanc testified that he was present when the seller reviewed all of the offers, and the seller had lawyers and other professionals with whom it worked in assessing each of the offers and which one to select. There is no evidence to show that Ally Saad's conduct in any way caused a loss on the part of Abdel–Hak even if Abdel–Hak had justifiably relied on any misrepresentations made by Ally Saad. Therefore, the Court concludes that the cause of action under § 523(a)(2)(A) must be dismissed.

### 11 U.S.C. § 523(a)(4)

Next, Abdel–Hak asserts that the Court should determine there to be a non-dischargeable debt under § 523(a)(4) of the Bankruptcy Code. Section 523(a)(4) excepts debts from discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny ...." Abdel–Hak did not allege embezzlement or larceny. Therefore, in order to prevail under § 523(a)(4), Abdel–Hak must prove that Ally Saad committed either fraud or defalcation while acting in a fiduciary capacity. As explained in the Court's discussion of Abdel–Hak's § 523(a)(2)(A) claim, Ally Saad did make a material misrepresentation. If this misrepresentation constitutes either fraud or defalcation, the salient question then is whether Ally Saad made such misrepresentation while acting in a fiduciary capacity.

■ Abdel–Hak asserts that there was a fiduciary relationship created between

him as buyer and Ally Saad as his agent. Both Abdel–Hak and Ally Saad testified that they understood the buyer/agent relationship to be a fiduciary relationship. That appears to be true under Michigan law. "A real estate agent is a fiduciary and it is not permissible for him to act in opposition to his principal." *Mackey v. Baker*, 327 Mich. 57, 41 N.W.2d 331, 335 (1950). Michigan's occupational code dealing with licenses in real estate transactions, Mich. Comp. Laws Ann. § 339.2517(9)(c), defines the "Buyer's agent" to mean:

> a licensee acting on behalf of the buyer in a real estate transaction who undertakes to accept the responsibility of serving the buyer consistent with those fiduciary duties existing under common law.

That statute also creates additional duties, including a requirement that a real estate agent provide a potential buyer on whose behalf he is acting with a written disclosure advising of his duties and responsibilities. Mich. Comp. Laws Ann. § 339.2517(2).

Although not briefed by the parties, the Court accepts the proposition of law advanced by Abdel–Hak that the buyer/agent relationship itself creates a fiduciary relationship under Michigan law for certain purposes. However, that is not the test for determining whether a fiduciary relationship exists for purposes of determining the non-dischargeability of a debt alleged to exist under § 523(a)(4) of the Bankruptcy Code. The mere fact that state law places two parties in a relationship that may have some of the characteristics of a fiduciary relationship does not necessarily mean that the relationship is a fiduciary relationship under § 523(a)(4). The question of who is a fiduciary for purposes of § 523(a)(4) is one of federal law. *See Carlisle Cashway, Inc. v. Johnson (In re*

*Johnson)*, 691 F.2d 249, 251 n. 2 (6th Cir. 1982) ("State law is merely a factor in the equation used to determine whether the fiduciary capacity requirement is satisfied as a matter of federal law, using federal standards.") (citations omitted).

The Sixth Circuit has addressed what is required to establish a fiduciary relationship for both defalcation and fraud under § 523(a)(4). In *Brady v. McAllister (In re Brady)*, 101 F.3d 1165 (6th Cir. 1996), the court discussed fiduciary fraud and found that "[t]he term 'fiduciary' under section 523(a)(4) applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity." 101 F.3d at 1173 (internal quotation marks and citations omitted). *In re Garver* dealt with defalcation. The Sixth Circuit observed that there is some disagreement among federal courts in determining whether a "fiduciary capacity" exists for purposes of § 523(a)(4). *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178 (6th Cir.1997). After surveying the case law, the Sixth Circuit subscribed to a narrow interpretation of the term. *Id.* at 178–79. The Court again found an express or technical trust requirement, holding that

> [t]he attorney client relationship, without more, is insufficient to establish the necessary fiduciary relationship for defalcation under § 523(a)(4). Instead, the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4).

*Id.* at 179. In determining whether a fiduciary capacity exists, the *Garver* court emphasized the importance of a res held in trust by a debtor rather than generalized fiduciary duties of confidence and loyalty. *Id.* Thus, a fiduciary capacity under either the defalcation or fraud subsections of

§ 523(a)(4), requires the existence of an express or technical trust.

■ This Court is bound by the narrower interpretation given to "fiduciary capacity" by the Sixth Circuit in *In re Garver* and *In re Brady*. In this case, there was no trust res, nor any express trust created. Ally Saad may have breached contractual obligations that he had to Abdel–Hak, and indeed may have breached fiduciary obligations created by Michigan law in his relationship with Abdel–Hak. However, those facts alone do not create a non-dischargeable debt under § 523(a)(4).[1] The Court does not rule out the possibility that a real estate agent in some cases may act in a fiduciary capacity for purposes of § 523(a)(4). *See Shappy v. Scott (In re Shappy)*, 201 B.R. 424, 435–36 (Bankr. E.D.Va.1996) (noting that a fiduciary relationship might exist between a real estate agent and client under § 523(a)(4) where the agent "misapplies an earnest money deposit or escrow funds entrusted to him" and rejecting the plaintiff's argument that the agent acted in a fiduciary capacity when the plaintiff "entrusted" the agent with the sale of her property and her "expectation of profits").

The Court concludes that Ally Saad did not act in a fiduciary capacity for purposes § 523(a)(4) when he represented Abdel–Hak. Therefore, the § 523(a)(4) count must be dismissed.

---

1. Section 523(a)(4) provides for non-dischargeability "for fraud or defalcation while acting in a fiduciary capacity". Most published opinions address the defalcation prong of § 523(a)(4) and not the fraud prong in that statute. The Sixth Circuit briefly discussed fiduciary fraud in *In re Brady*, but did not reach a decision on the merits because there were independent grounds to find the debt non-dischargeable. 101 F.3d at 1173–74. Other courts have determined that the fraud required under § 523(a)(4) "refers to positive

## 11 U.S.C. § 523(a)(6)

■ Finally, Abdel–Hak's complaint asserts that there is a non-dischargeable debt under § 523(a)(6) of the Bankruptcy Code. The elements of non-dischargeability under § 523(a)(6) are (1) desire to cause the consequences of the act or a belief that the consequences are substantially certain; and (2) no just cause or excuse. *See Tinker v. Colwell*, 193 U.S. 473, 485–86, 24 S.Ct. 505, 48 L.Ed. 754 (1904) (defining "malice" under § 17(a)(2) of the former Bankruptcy Act (now § 523(a)(6)) as "a wrongful act, done intentionally, without just cause or excuse") (internal quotation marks and citation omitted); *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 580 (6th Cir. 2001). In *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the U.S. Supreme Court found that for purposes of § 523(a)(6), the requirement of "willfulness" means that the debtor must intend the injury. Subsequently, the Sixth Circuit has somewhat broadened this holding in *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999) to include not only a debtor's subjective intent to injure, but also the debtor's subjective belief that the injury is "substantially certain to result" from his actions.

■ There was no direct proof in the record to show an intent to injure by Ally Saad. Further, it would be illogical to infer such intent. There is nothing in the record to show that Ally Saad derived a

---

fraud, involving moral turpitude …." *S.J. Groves & Sons Co. v. Peters (In re Peters)*, 90 B.R. 588, 605 (Bankr.N.D.N.Y.1988) (citing cases) (internal quotation marks omitted). Although there was a misrepresentation made by Ally Saad, there is no evidence in this record of "moral turpitude" on his part. Nor is there evidence of defalcation. However, the absence of proof as to those facts is irrelevant in light of the Court's finding that there was no fiduciary capacity.

greater benefit by having Jason Saad's offer accepted and Abdel–Hak's offer rejected. There was no evidence to show that Ally Saad gained some hidden interest in the property after it was purchased by Jason Saad. In fact, Ally Saad testified that he would have had a higher commission had the purchase offer made by Abdel–Hak been accepted rather than the Jason Saad offer. Although Ally Saad eventually received another commission when Mariam Saad sold the property three years after she purchased it, it is equally plausible that Ally Saad would have received the identical commission if Abdel–Hak had purchased the property and then re-sold it years later. The Court concludes that Abdel–Hak failed to prove by a preponderance of the evidence that Ally Saad either intended an injury or that he knew that an injury was substantially certain to result from his actions. While he may have breached a contractual relationship, or even a fiduciary relationship under Michigan law, the Court finds that there was no subjective intent to cause any injury to Abdel–Hak on the evidence in the record.

Accordingly, the Court holds that Abdel–Hak has failed to prove by a preponderance of the evidence that there is a non-dischargeable debt under § 523(a)(2)(A), (4), or (6). The Court will enter an order dismissing the complaint consistent with this opinion.