**In re Jay D. McCLINTIC, Debtor.**

**Liberty Savings Bank, FSB, Plaintiff,**

v.

**Jay D. McClintic, Defendant.**

**Bankruptcy No. 05–74612.**
**Adversary No. 06–02175.**

United States Bankruptcy Court,
S.D.Ohio,
Eastern Division.

March 12, 2008.

G. Thomas Kisor, Thomas R. Merry, Barren and Merry Co., LPA, Westerville, OH, for Plaintiff.

Jay D. McClintic, Columbus, OH, pro se.

### MEMORANDUM OPINION AND OR-DER REGARDING COMPLAINT TO DETERMINE DISCHARGE-ABILITY OF LIBERTY SAVINGS BANK, FSB (NO. 1)

CHARLES M. CALDWELL,
Bankruptcy Judge.

This Memorandum Opinion and Order serves as the Court's findings of fact and conclusions of law. The subject is the Complaint to Determine Dischargeability of Liberty Savings Bank, FSB ("Plaintiff") filed against the chapter 7 Debtor, Jay D. McClintic ("Defendant"). Plaintiff alleges that the Defendant, through the use of inflated appraisals, caused it to lend funds in excess of the value of two properties, pocketing a significant portion of the proceeds. Recovery is premised upon section 523(a)(2)(A) of the United States Bankruptcy Code ("Code"), that precludes the discharge of fraudulent obligations.

Based upon the evidence, the pleadings and the statements of the parties, the Court has determined that the Plaintiff has established that the Defendant, by omission, participated in the misrepresentation of material terms of the real estate transactions. Plaintiff, however, has not sustained its burden of proof on other essential components—justifiable reliance, intent to deceive and proximate cause. On this basis, the Court finds and concludes

that it is compelled to render judgment for the Defendant. A brief summary illustrates the bases for this decision.

The Defendant has been in the real estate business for approximately 38 years, and was the sole shareholder, officer and director of 246 Development Corp. dba WP Inc. ("WP"). Through this entity the Defendant, as President, purchased, renovated and sold homes, including 326 West Park Avenue ("Park") and 757 West Rich Street ("Rich"), in Columbus, Ohio. On October 17, 2000, WP purchased Park for $ 29,500.00, and two months later, on December 20, 2000, it purchased Rich for $22,500.00.

The dispute between the parties emanates from WP's immediate re selling of Park and Rich to Jerry and Cheryle Sager ("Sagers"). The Sagers owned other investment properties, and found WP and the Defendant through a newspaper advertisement. The Defendant executed the requisite sale and closing documents on behalf of WP, as its President. A mere two months after purchasing Park, WP re sold it to the Sagers on December 19, 2000, according to the settlement statement, for $ 70,000.00, representing a gain of $40,500.00. Even more fortuitously, on the very same date that WP purchased Rich (December 20, 2000), it was re sold to the Sagers for $70,000.00, according to the settlement statement. This constitutes an even higher gain of $47,500.00.

The Plaintiff financed these transactions, but the loans were originated by a wholesale broker, Unisource Funding ("Unisource"). According to originating appraisals performed by John K. Welsh Appraisal Services ("Welsh"), Park had a market value of $70,000.00 as of October 16, 2000, and Rich was valued at $70,000.00 as of September 29, 2000. There is no indication in the record, however, that the

Defendant exercised any control over Welsh and/or Unisource. Also, the Plaintiff did not present any testimony from these parties, even though they made the sales possible.

All of these events may very well have remained the apparent offspring of serendipity, but for the fact that this fortune turned out to be aided a bit by the actions of the buyers and seller. In reality as part of the deal, the Defendant through WP and the Sagers, arranged for a significant portion of the loan proceeds to be returned to the Sagers after the closings. The sting of this artifice is made worse by the fact that it was not disclosed in the purchase agreements and closing documents. The Plaintiff's representative, Cynthia M. Peyton ("Ms. Peyton") and the closing agent, Ms. Stana Krivda ("Ms. Krivda"), both testified that they were not aware.

Regarding Rich, on the date of closing (December 20, 2000) a check for $23,327.40 was issued to the Sagers by WP. This same pattern was followed for Park when on the date of closing (December 19, 2000) WP returned to the Sagers their $8,000.00 check, that served as an apparent down payment, in addition to issuing another check to the Sagers for $15,000.00. According to the credible testimony of Mr. Sager, a portion of the sale proceeds in both transactions was rebated to cover the down payments and to defray the mortgage payments on the properties when not rented.

Approximately two years later, the Sagers began experiencing financial difficulties, and defaulted on the mortgage obligations. As a result, on October 4, 2002, they filed a voluntary petition under chapter 7 of the Code (Case No. 02–63093), and

scheduled the vacant properties as having values of $ 38,000.00 (Park) and $45,000.00 (Rich). Unlike the instant bankruptcy case, the Plaintiff did not pursue dischargeability proceedings against the Sagers, and they received a discharge on January 30, 2003. Ultimately, the Plaintiff obtained stay relief in the Sager's bankruptcy case and foreclosed. On October 20, 2003, Rich was sold for $22,000.00, and on October 23, 2003, Park was sold for $23,000.00. According to the Plaintiff's records it suffered a loss of $39,623.51 for Rich, and $41,603.12 for Park.

With reference to Rich, Fannie Mae sought reimbursement from the Plaintiff for the Sagers' default. This action was premised upon several problems that Fannie Mae identified with the originating appraisal, including: a. it failed to disclose that WP acquired the property within a mere 12 months prior to the sale to the Sagers, possibly violating the Uniform Standards of Professional Appraisal Practice; b. the appraiser used larger homes as comparable sales; c. the appraiser upwardly adjusted the comparable sales without justification; d. the appraiser understated the number of baths and parking for the comparable sales; and, e. one of the comparable sales actually included two properties, while only one was disclosed in the appraisal. Significantly, in response to Fannie Mae, the Plaintiff defended the originating appraisal, and further asserted that it obtained a broker's price opinion that supported the value.

■ In view of its significant losses, the Plaintiff now seeks a judgment of non dischargeability based upon section 523(a)(2)(A) of the Code.[1] In order to es-

---

**1.** The applicable statutory provision is as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—...

tablish that a debt is non dischargeable under this section, a creditor must prove:

(1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

(2) the debtor intended to deceive the creditor;

(3) the creditor justifiably relied on the false representation; and

(4) its reliance was the proximate cause of loss.

*Rembert v. Citibank South Dakota, N.A. (In re Rembert),* 141 F.3d 277, 280–281 (6th Cir.1998) *cert. denied* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). Each of these elements must be established by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 n. 11, 111 S.Ct. 654, 661 n. 11, 112 L.Ed.2d 755 (1991). Any exception to discharge is to be construed strictly in favor of debtors. *In Rembert,* 141 F.3d at 281 *citing Manufacturer's Hanover Trust v. Ward (In re Ward),* 857 F.2d 1082, 1083 (6th Cir.1988).

■ "False pretenses" have been defined as conduct intended to give a false impression that serves as an implied misrepresentation. *Wings & Rings, Inc. v. Hoover (In re Hoover),* 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999). Mere silence regarding a material fact may constitute a false representation. *In re Hoover,* 232 B.R. at 700; *Lester v. Meadows (In re Meadows),* 213 B.R. 699, 702 (Bankr. S.D.Ohio 1997); *Blascak v. Sprague (In re Sprague),* 205 B.R. 851, 859 (Bankr.

N.D.Ohio 1997); *Abdel–Hak v. Ally Saad (In re Saad),* 319 B.R. 147, 154 (Bankr. E.D.Mich.2004).

■ Because debtors are unlikely to admit they intended to deceive, it may be inferred from the totality of the circumstances; i.e., their actions at the time of and subsequent to the loss. Also, courts may examine whether there is any reasonable explanation for the failure to disclose material information. *Broadway Bank v. Abdallah, et. al (In re Abdallah),* 2007 WL 3047214, *3 (Bankr.N.D.Ohio 2007).

■ Essentially, the object is to, " . . . consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." *Bernard Lumber Co., et al. v. Patrick (In re Patrick),* 265 B.R. 913, 916–917 (Bankr. N.D.Ohio 2001); *Crawford, et al. v. Monfort (In re Monfort),* 276 B.R. 793, 796 (Bankr.N.D.Ohio 2001); *In re Hoover,* 232 B.R. at 700. Also, intent to deceive may be inferred where the false impressions or representations are made with a reckless disregard for their accuracy. *Visotsky v. Woolley (In re Woolley),* 145 B.R. 830, 835–836 (Bankr.E.D.Va.1991); *Meggs v. Booth (In re Booth),* 174 B.R. 619, 624 (Bankr.N.D.Ala.1994); *Wright v. Fowler (In re Fowler),* 165 B.R. 617, 619 (Bankr. N.D.Ohio 1994).

■ In addition to intent to deceive, creditors must prove "justifiable reliance" on the representations,[2] and the closely

---

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. Sec. 523(a)(2)(A).

**2.** Under section 523(a)(2)(A), the standard is "justifiable reliance" as opposed to "reasonable reliance" under section 523(a)(2)(B) (False Financial Statements). One commentator has defined the distinction as follows:

Justifiable reliance can be found in the gray area that exists between actual and reasonable reliance. This standard of reliance requires more than mere actual reliance, but does not require the type of investigation re-

related requirement of proximate causation. The latter may be established by showing the conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow. *In re Hoover*, 232 B.R. at 700. Where banks have established a history of dealing, involving trust and confidence, they may be justified in relying on that customer's representations. *Columbo Bank, FSB v. Sharp (In re Sharp)*, 2007 WL 2898704, *4 (Bankr. D.Md.2007). On the other hand, where there is no history, the bank is sophisticated, the sums are significant, and the lender restricts its inquiry to information provided by the borrower, it is more difficult to establish justifiable reliance. *In re Sharp*, 2007 WL 2898704 at *4.

■ Further, in business transactions creditors are required to utilize their senses, and can not blindly rely on representations that could be proven false by a routine examination. *Waring v. Austin (In re Austin)*, 317 B.R. 525, 530–531 (8th Cir. BAP 2004), *aff'd* 177 Fed.Appx. 505 (8th Cir.2006); *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 686 (10th Cir. BAP 2006). The failure of a bank to present any evidence to establish justifiable reliance makes it impossible for courts to make a finding of non dischargeability. *Alta One Federal Credit Union v. Bumgarner (In re Bumgarner)*, 2007 WL 4901490, *4–*5 (Bankr.M.D.Fla. 2007).

■ In real estate transactions banks base their financing decisions on: a. the price paid; b. the value of the property; c. the income of the borrower; d. the condition of the property and whether funds will be needed to renovate; and, e. for rental property, whether it is currently occupied and the potential income; etc. All of this data is material to deciding whether the prospective borrower has the financial ability to renovate and maintain the property, while simultaneously making the payments. Turning to the facts in this case, the Court finds and concludes from the testimony and documents admitted into evidence, that the Defendant and the Sagers omitted material information about their transactions; i.e., that a significant portion of the loan proceeds would be returned to the Sagers.[3]

The unanswered question in this case, however, is whether such omissions rise to the level that the losses asserted by the Plaintiff should be deemed non dischargeable. Here, the Plaintiff, that bears the burden of proof by a preponderance of the evidence, has not provided critical information to support a finding of the requisite elements of intent to deceive, justifiable reliance and proximate cause.

■ The heart of the Plaintiff's case is that inflated appraisals were obtained in order for Defendant and the Sagers to fraudulently acquire loans from the Plaintiff. It is asserted that this allowed the

---

quired by reasonable reliance.... *[It] is a more subjective standard ... that takes into account the interactions between and experiences of the two parties involved. This standard ... is a "fact-sensitive standard" that depends on "the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."* Jeffrey R. Priebe, *"Field v. Mans* and *In re Keim:* Excepting Debts From Bankruptcy Discharge and the Difference Between "Experienced Horsemen" and "Reasonable Men," 54 Ark.L.Rev. 109–110 (2001). (emphasis supplied) (citations omitted).

**3.** Contrary to the position taken by the Defendant, he can be held accountable, even though the sale documents were executed in his corporate capacity. Where tortious action is established personal liability may be imposed, or in certain instances Ohio law allows courts to overlook corporate formalities. *Lambert, et al. v. Kazinetz, et al.*, 250 F.Supp.2d 908, 914 (D.S.D. Ohio 2003).

Defendant to pocket proceeds in excess of the true value of the properties, and share a generous portion with the Sagers. Yet, the Plaintiff did not present any testimony from the appraiser, Welsh. All that is known, is that there appears to be some significant and suspicious discrepancy between what the Defendant paid for the properties and the sale price for the Sagers. What is not known, however, is whether the Defendant and/or the Sagers acted to influence the appraiser, and whether he derived any financial benefit.

It would seem that such information could have been obtained by subpoena to the appraiser, including bank records. Even if such information was not available, testimony from the parties that performed the analysis of the Rich transaction for Fanny Mae, may have been helpful. Instead, all that has been provided is correspondence between the Plaintiff and Fannie Mae, that indicates that there are some significant questions over the efficacy of one of the appraisals. What we still don't know is whether such questions rise to the level to support a finding of intent to deceive.

Also, critical to a finding of intent, is the issue of what drove the lending decision. What is known is that originally the Plaintiff refused to grant the loans due to the Sagers' deficient income. The witness provided by the Plaintiff, Ms. Peyton, however, was not involved in the lending decision. She could not precisely state what was presented to change the Plaintiff's view, and what other factors may have been considered. Indeed, she testified that the underwriters involved were no longer employed by the Plaintiff.

██ This lack of information is not only significant to a finding of intent to deceive, but also bears upon justifiable reliance and proximate causation. If Fannie Mae could find enough information to raise serious doubt regarding the efficacy of at least one of the appraisals four years later, why weren't these issues discovered by the Plaintiff, prior to closing. Here again, we don't know specifically what was reviewed prior to closing, because the persons directly involved on behalf of the Plaintiff were not called to testify.

Finally, Ms. Peyton stated that the transactions were originated by one of their wholesale brokers, Unisource. As in the case of the appraiser, however, no testimony from a Unisource employee was provided. It would appear that at a minimum they could have testified regarding any relationship or influence by the Defendant and/or the Sagers, and what actions they took to scrutinize the transactions before presenting them to the Plaintiff.

For these reasons, the Court is only left with transactions that on the surface appear suspect. That, however, is not enough given the fact that the Code favors granting a discharge. We must be able to find intent to deceive, reliance that is justified, and find that reliance caused the loss, rather than creditor oversight. The Court is compelled to find and conclude that the Plaintiff has not sustained its burden of proof on the record, as it currently stands.

Accordingly, judgment is rendered in favor of the Defendant.

**IT IS SO ORDERED.**