In re Edward C. THOMPSON, Jr., Debtor.

Coughlin Chevrolet, Inc., Plaintiff

v.

Edward C. Thompson, Jr., Defendant.

In re James V. Ward, Debtor.

Coughlin Chevrolet, Inc., Plaintiff

v.

James V. Ward, Defendant.

Bankruptcy Nos. 09–50201, 09–58350. Adversary Nos. 09–2233, 09–2484.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Sept. 30, 2011.

See also 2011 WL 4634208.

Richard K. Stovall, Columbus, OH, for Debtor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

C. KATHRYN PRESTON, Bankruptcy Judge.

On November 15, 2010, this cause came on for joint trial in the above-captioned adversary proceedings. Present at the hearing were Thomas R. Merry representing Plaintiff Coughlin Chevrolet, Inc. ("Plaintiff"), and Rick L. Ashton and Richard K. Stovall representing Debtors Edward C. Thompson, Jr. and James V. Ward ("Thompson" and "Ward" respectively; collectively, the "Debtors"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the General Order of reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Plaintiff seeks to except from discharge debt allegedly owed by Debtors, pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and/or (a)(6).

Upon the evidence adduced at the hearing and the exhibits entered into evidence, the Court makes the findings and conclusions set forth below. Because Plaintiff failed to demonstrate a basis for piercing the corporate veil and failed to show it is entitled to judgment under § 523(a)(2), (4), or (6), judgment will be entered in favor of Debtors.

## I. Findings of Fact

Debtors jointly owned and operated Florida Physicians Leasing, Co. Inc. ("FPL"), an automobile sales and leasing company in Florida, sometimes doing business as Physicians Leasing Co., Inc. They also owned Thompson & Ward Leasing Co., Inc. ("T & W"), an automobile sales and leasing company operating in Ohio. They also owned W & T Properties ("W & T Properties"), a general partnership which owned the premises in Ohio and Florida where FPL and T & W maintained offices, as well as a residential condominium in Florida. FPL was established in 1989. Debtors were the sole equity owners and the sole officers for all of the business entities. FPL employed approximately four to seven others in addition to Debtors. The company maintained bank accounts at National City Bank, U.S. Bank, and First Merit Bank, separate from those of the other entities and Debtors' other business interests. It also maintained bank accounts under its trade name of Physicians Leasing Co. Inc. ("Physicians Leasing") at the same banks. Debtors both had access to and signing authority for the company bank accounts, as did two other employees.

T & W had approximately fifteen employees. T & W also maintained its bank accounts at National City Bank, U.S. Bank and First Merit Bank, separate from those of the other entities and Debtors' other business interests.

Both Debtors were involved in the daily operations of the company in supervisory capacities, and concede that they had the ultimate decision-making authority for the

company. Thompson focused on the financial side, while Ward supervised the sales effort. Together they exercised ultimate control over all of the entities. However, there were multiple management levels and Debtors were not typically involved in daily operational tasks such as hiring and firing employees, talking to customers, opening mail, and negotiating or depositing incoming checks. In particular, Debtors were not usually involved in negotiating or closing individual vehicle sales or leasing transactions.

On August 20, 2008, FPL contracted with Plaintiff for the purchase of a 2009 Toyota Camry ("Camry") for the amount of $29,346. The contract was executed on behalf of FPL by an FPL salesperson. FPL intended to purchase the Camry from Plaintiff and then sell it to Dr. Robert Janicki, who had previously contacted FPL about purchasing such a car. Plaintiff and FPL had a long standing business relationship; FPL would usually purchase at least a dozen cars from Plaintiff each year. On or about August 25, 2008, Dr. Janicki purchased the Camry for the sum of $32,094.00. Dr. Janicki had paid a $500 deposit, was credited $20,000 for his trade-in vehicle, and owed the balance of $12,-650.58 [1]. Debtors were not involved in the negotiation of the sale, did not discuss or negotiate the purchase of the Camry with Plaintiff, and were not any more closely involved in this transaction than any other done by FPL. Debtors rarely knew about specific transactions unless the salesperson needed assistance getting to a closing or calculating the numbers for a particular sale. Even when a salesperson needed such assistance, he or she went first to the supervisor, only resorting to consulting Debtors when the manager was unable to provide sufficient help. Neither of Debtors had specific knowledge of the transaction with Plaintiff until sometime after FPL closed its doors.

Upon delivery of the Camry to FPL, Plaintiff did not transfer to FPL the Manufacturer's Statement of Origin ("MSO") (also known as a "Certificate of Origin for a Vehicle"). Normally, Plaintiff would hold the MSO until FPL paid Plaintiff the purchase price for a vehicle. FPL had paid Plaintiff on all prior deals, and invoices were typically paid in 30–35 days. However, as recently as June, 2008, FPL paid a Coughlin invoice 55 days after being invoiced for a purchase. In fact, the sale of the Camry is the only contract with Plaintiff on which FPL defaulted during the parties' longstanding business relationship.

The evidence is unclear about each individual business's financial condition but as a whole, the businesses appear to have been insolvent at this time. Nonetheless, the businesses were managing to pay their debts in an acceptable fashion. Some time after FPL and Plaintiff entered into the purchase contract for the Camry, FPL and the related business entities went into rapid decline. Debtors sought advice of counsel to deal with the business issues and, presumably, winding down the businesses. In October 2008, FPL's banking relationships failed: FPL and the affiliated entities had been in the practice of transferring funds between the companies and from account to account at National City Bank and U.S. Bank, to cover checks written by the account holder as the checks were presented. FPL office employees, Rose Klos and Cynthia Chapman, managed the bank accounts and handled the daily banking for all the companies. Na-

[1]. No evidence was presented whether Dr. Janicki paid the remaining balance of the purchase price for the Camry.

tional City Bank would contact FPL daily to let them know what checks had been presented, so that deposits could be made. Near the end of September, National City abruptly changed its policy on handling the accounts, and notified FPL that it would no longer provide this service.

Then financial chaos ensued: On October 3rd, National City closed one of T & W's accounts and froze another, which had a negative impact on FPL's accounts and the ability of the businesses to transfer funds back and forth. As a result, National City refused any deposits, checks drawn on the accounts were returned by National City to the depository bank and attempted transfers from FPL accounts to other accounts were rejected. There was limited money to fund business operations, including payment to Plaintiff for the Camry. During this time, the salespeople were unaware that the business would be closed imminently. They continued making contacts, pursuing deals and negotiating leases.

Thereafter, FPL accounts and the W & T accounts at U.S. Bank were also frozen or closed. All of the operating entities ceased doing business on the same day— October 7 or 8, 2008. On October 23, 2008, U.S. Bank setoff the balance remaining ($213,000) in the Physicians Leasing Co., Inc. account, presumably to apply to the outstanding loan of FPL and its related entities. Debtors found out about the specifics of the Camry transaction and the debt to Plaintiff as they were gathering business documents to provide to their attorneys.

Some time after FPL ceased operating, Todd Adcock, Chief Financial Officer of Plaintiff, attempted to contact Debtors about the balance due for the purchase of the Camry. Plaintiff specifically request-ed that either the Camry be returned, or the proceeds from the sale of the Camry be turned over. He obtained neither. Knowing that Plaintiff was still in possession of the MSO, Mr. Adcock conducted a public records search to determine what had happened to the Camry. He found that on or about May 11, 2009, Dr. Janicki had applied for a Certificate of Title from the State of Florida, and all indications are that Dr. Janicki received it.

## II. Conclusions of Law

Because the overarching purpose of the Bankruptcy Code is to provide a fresh start to those in need of relief from the collection efforts of creditors,[2] exceptions to discharge are to be strictly construed against the complaining party. *Rembert v. AT & T Universal Card Serv., Inc. (In re Rembert),* 141 F.3d 277, 280–81 (6th Cir.1998), *cert. denied,* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). However, the relief provided by the Bankruptcy Code is intended only for the "honest but unfortunate" debtor and not to protect perpetrators of fraud or those who engage in egregious conduct. *Grogan,* 498 U.S. at 287, 111 S.Ct. 654. To that end, Congress enacted 11 U.S.C. § 523 and 11 U.S.C. § 727 to provide injured creditors avenues through which to except particular debts from discharge, or to object to issuance of a discharge altogether.

Inasmuch as the obligation for payment of the purchase price for the Camry is that of FPL, the first question to be addressed is whether Plaintiff may "pierce the corporate veil" to hold Debtors liable for the debt owed by FPL to Plaintiff.

A. *Plaintiff Cannot Pierce the Corporate Veil to Hold Debtors Liable for the Debt of FPL.*

Under Ohio law,

---

2. *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation. *See* Presser, Piercing the Corporate Veil (1991) 1–4. An exception to this rule was developed in equity to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes. "That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; but like every other fiction of the law, when urged to an intent and purpose not within its reason and policy, may be disregarded." *State ex rel. Atty. Gen. v. Standard Oil Co.* (1892), 49 Ohio St. 137, 30 N.E. 279, paragraph one of the syllabus. Under this exception, the "veil" of the corporation can be "pierced" and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity. Courts will permit individual shareholder liability only if the shareholder is indistinguishable from or the "alter ego" of the corporation itself.

*Belvedere Condo. Unit Owners' Ass'n. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (Ohio 1993). The *Belvedere* Court went on:

> Thus, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 289, 617 N.E.2d 1075.

The first prong of the *Belvedere* test is a restatement of the alter-ego doctrine, which requires the plaintiff to "show that the individual and the corporation are fundamentally indistinguishable." *Belvedere*, 617 N.E.2d at 1086. To determine whether the company is an alter ego of the individual, Ohio courts consider such factors as:

> (1) [G]rossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 422, 602 N.E.2d 685, 689 (Ohio Ct.App.1991) (citations omitted). Other Ohio courts have also considered factors such as whether there was commingling of business and personal finances, whether separate books and records were kept, whether the company had issued stock, and whether there was misappropriation of company funds or property. *Id.*

Although Debtors admittedly held ultimate control over the businesses, the Court cannot find that their control over FPL was so complete that the corporation had no separate mind, will, or existence of its own. There were multiple levels of management of the company, many of whom made important company decisions, such as hiring and firing employees, negotiating sizable contracts, and handling

company accounts. Two other employees had banking authority. Additionally, FPL had separate bank accounts. There is no indication that Debtors used the accounts as their own private sources of funds or otherwise diverted Corporate funds or property to their own purposes. The funds that they receive from FPL were limited to their salaries. Debtors observed corporate formalities, maintaining books of account and properly recognizing intercompany transfers. There is no evidence that Debtors at any time held themselves out as personally liable for corporate obligations. In light of the fact that the company collapsed shortly after FPL acquired the Camry, the Court may surmise that FPL was insolvent at the time it incurred the debt to Plaintiff; however, there is no evidence that the company was undercapitalized from its inception. And there is no evidence that Debtors suspected imminent demise of the businesses or made any representations to anyone about the company's financial condition. In fact, FPL seemed to be meeting most of its financial obligations. Mr. Adcock admitted that neither FPL nor Debtors made any representations with respect to the purchase of the Camry, other than the term of the contract promising to pay for the vehicle.

Plaintiff pointed out that W & T Properties owned a residential condominium for which FPL and/or T & W paid the mortgage payments. However, Debtors illustrated that the condominium served a business purpose: Debtors needed to travel to FPL's business site monthly, and stayed at the condominium. The payment of the condominium mortgage was less costly than staying in a hotel.

In short, there is insufficient evidence on which the Court can apply the alter ego doctrine in order to impose liability FPL's debt on Debtors.

In connection with the second prong of the *Belvedere* test, the Ohio Supreme Court noted that "mere control over a corporation is not in itself a sufficient basis for shareholder liability." *Belvedere,* 617 N.E.2d at 1086. The Court subsequently emphasized the requirement of wrong doing, stating that a party seeking to pierce the corporate veil "must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Dombroski v. WellPoint, Inc.,* 119 Ohio St.3d 506, 895 N.E.2d 538 (2008). However, Ohio's high court cautioned that, "Courts should apply this ... cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Id.,* 895 N.E.2d at 545. The Court recognized that, since closely-held business entities are generally under the complete control of one or just a few equity owners, a more relaxed standard of unjust or inequitable conduct would result in piercing of the veil virtually every time a closely held entity is sued, inasmuch as "nearly every lawsuit sets forth a form of unjust or inequitable action...." *Id.,* at 544–45. The court in *LeRoux's Billyle Supper Club,* reiterated the point: "[D]ominance of and control over a corporation by a shareholder is insufficient, standing alone, to render the shareholder liable for corporate debts." *LeRoux's Billyle Supper Club,* 77 Ohio App.3d at 425, 602 N.E.2d 685 (citations omitted). To hold otherwise would emasculate the long standing corporate law recognizing the separate and independent existence of a corporate or other business entity.

Undoubtedly, Debtors were in ultimate control over the corporate affairs of FPL. But there is a lack of evidence that they utilized the corporation in such a manner

as to commit fraud, an illegal act, or a similarly unlawful act. The simple fact illustrated by the evidence is that the business had insufficient funds to pay all of its debts. When National City Bank froze its primary account, the company lost the ability to meet its cash flow needs. At that point, there was not enough money to go around, forcing the company, under the supervision of Debtors, to make hard decisions where to expend the available money. Under the circumstances of this case, the fact that Plaintiff went unpaid is not by itself sufficient to find fraud or unlawful actions.

■ The elements of proof necessary to pierce the corporate veil are described by the Ohio Supreme Court in the conjunctive. Therefore, Plaintiff must prove all three elements in order to prevail. Having failed to illustrate the first and second elements of the test, Plaintiff's cannot succeed on its Complaint. The Court recognizes that Plaintiff also argued that a corporate officer can be held personally liable for corporate debts when that officer is involved in a tort. As argued in this case, Plaintiff asserts that Debtors were actively involved in the tort of conversion of Plaintiff's property and as such, under Ohio law, can be held personally liable for the debts of FPL. For the reasons stated below, Plaintiff's argument is moot.

**B.** *Plaintiff Has Not Demonstrated False Pretenses, False Representations, or Actual Fraud Under Section 523(a)(2)(A).*

■ Plaintiff's first cause of action is brought under § 523(a)(2)(A) of the Bankruptcy Code. That section provides in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, [or] property to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud ....

11 U.S.C. § 523(a)(2)(A). Plaintiff must prove its case by a preponderance of the evidence. *Grogan*, 498 U.S. at 291, 111 S.Ct. 654 (holding that the standard of proof for the dischargeability exception in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard).

■ Even if Plaintiff had shown that the corporate veil of FPL should be pierced to visit liability on Debtors, Plaintiff has failed to demonstrate that the debt owed should be declared nondischargeable. Plaintiff failed to show that the Camry was obtained through false pretenses, a false representation or actual fraud.

■ For a party to succeed on a claim for false representations, it must prove: 1) the debtor obtained the money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; 2) the debtor intended to deceive the creditor; 3) the creditor justifiably relied on the false representation; and 4) the creditor's reliance was the proximate cause of the loss. *Rembert*, 141 F.3d at 280.

The evidence shows that with respect to the purchase of the Camry, Debtors made no express representations whatsoever to Plaintiff. Plaintiff argues that Debtors made a false representation by entering into the purchase contract for the Camry knowing that FPL could not meet the financial obligation, and with no intent to ever pay the purchase price to Plaintiff. As explained in greater detail below, Plaintiff's approach fails because Plaintiff did not show that Debtors did not intend to pay the purchase price of the Camry to Plaintiff.

For purposes of § 523(a)(2)(A), actual fraud is defined broadly—"any deceit, artifice, trick or design involving a direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating a cheat or deception." 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2010). *See also McClellan v. Cantrell,* 217 F.3d 890, 899 (7th Cir.2000) ("[B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation.") (citing 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (Lawrence P. King ed., 15th ed. 2000)). "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan,* 217 F.3d at 899 (citations omitted). Actual fraud has also been defined as "deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Blascak v. Sprague (In re Sprague),* 205 B.R. 851, 859 (Bankr. N.D.Ohio 1997). In order to prevail under § 523(a)(2)(A), the Plaintiff must illustrate that the existence of an actual or positive fraud; fraud implied by law is not sufficient. *Rembert,* 141 F.3d at 281.

False pretenses are distinguishable from false representations in that "[a] false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression while a false representation involves an express representation." *Goldberg Securities, Inc. v. Scarlata (In re Scarlata),* 127 B.R. 1004, 1009 (N.D.Ill.1991). *See also Sprague,* 205 B.R. at 859; *Wings & Rings, Inc. v. Hoover (In re Hoover),* 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999).

In order to compel the Court to except the debt for the Camry from discharge, Plaintiff must show that Debtors acted with intent to defraud Plaintiff before Plaintiff parted with the Camry—that they plotted all along to gain possession and ownership of the Camry with no intention of paying Plaintiff for it. *See* 11 U.S.C. § 523(a)(2)(A) ("A discharge ... does not discharge ... any debt ... for money [or] property ... *to the extent obtained by* ... false pretenses, a false representation, or actual fraud...." (Emphasis added.)). This, Plaintiff has not done. It is uncontroverted, and the Court finds credible the testimony of Debtors that Debtors had no knowledge of the transaction with Plaintiff until after the businesses had closed. They did not typically become involved in negotiating sales and they were not involved in negotiating this one. Debtors did not personally handle the closing of the sale of the Camry with Dr. Janicki. Plaintiff failed to offer any evidence that Debtors knew about the sale of the Camry prior to the businesses closing. Aside from this, the businesses were paying their creditors in August, 2008, when the Camry was obtained from Plaintiff. And the evidence suggests that Debtors believed the business would continue to operate into the foreseeable future. There is no evidence to support a finding of fraud or from which this Court could infer fraud on the part of Debtors. Similarly, there is no evidence to support, or from which the Court could infer that Debtors made an implied false representation or engaged in conduct intended to create or foster a false impression. This is simply an unfortunate situation whereby Plaintiff was caught in

the downward slide of a business and left unpaid when insufficient funds were left at the end of the day to pay all of the company's obligations.

### C. Plaintiff Has not Demonstrated Fraud or Defalcation While Acting in a Fiduciary Capacity or Embezzlement Under Section 523(a)(4).

Although Plaintiff has failed to "pierce the corporate veil" of FPL so as to hold Debtors liable for the debt owed by FPL to Plaintiff, the Court will nonetheless consider Plaintiff's second cause of action which is brought under § 523(a)(4) of the Bankruptcy Code. That section provides in pertinent part:

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. . . .

11 U.S.C. § 523(a)(4).

The phrase "while acting in a fiduciary capacity" applies only to the words "fraud or defalcation"; embezzlement and larceny are separate grounds for non-dischargeability under § 523(a)(4) whether or not a fiduciary relationship existed. *Nat'l City Bank v. Imbody (In re Imbody)*, 104 B.R. 830, 840 (Bankr. N.D.Ohio 1989). Therefore, a plaintiff can prevail under § 523(a)(4) by establishing that the defendant committed either (1) fraud or defalcation while acting in a fiduciary capacity, or (2) embezzlement, or (3) larceny.

While Plaintiff's Complaint states a cause of action for embezzlement, Plaintiff argued that evidence supported a finding that Debtors perpetrated fraud or defalcation while acting in a fiduciary capacity, as well as embezzlement. Therefore, the Court will examine whether the debt to Plaintiff is nondischargeable under § 523(a)(4) for either fraud or defalcation while acting in a fiduciary capacity, or embezzlement.

### 1. Plaintiff Has Not Established That A Fiduciary Relationship Existed Under Section 523(a)(4).

The "fiduciary capacity" component of § 523(a)(4) has been interpreted by the Sixth Circuit Court of Appeals to apply only to those situations involving an express or technical trust; establishing the existence of such a trust requires the creditor to show "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *Ohio Carpenter's Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639–40 (6th Cir.2007) (quoting *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 391–92 (6th Cir.2005)). The evidence does not support the establishment of an express or technical trust in this case. To the contrary, Plaintiff's CFO, Mr. Adcock, testified that Plaintiff did not care what happened to the Camry as long as Plaintiff was paid. Furthermore, Mr. Adcock testified that Plaintiff did not expect the proceeds from the sale of the Camry to be turned over to Plaintiff, and that Plaintiff did not care where the money came from, as long as Plaintiff was paid for the Camry. Furthermore, at least from Plaintiff's perspective, there was no intended beneficiary of the Camry. Mr. Adcock testified that Plaintiff did not know of an intended purchaser of the Camry prior to its transaction with FPL. Plaintiff failed to produce evidence to establish the creation of a trust or to define the intended beneficiary. Therefore, an express or technical trust was not established.

Plaintiff also asserts that the existence of a state statute or common law doctrine imposing trust like obligations may in some circumstances be sufficient to

create a trust relationship for purposes of § 523(a)(4). This theory is supported by Sixth Circuit case law. See *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963 (6th Cir.2009). However, as recognized by this Court in *Perry v. Ichida*, in order for this theory to apply, there must be a specific Ohio statutory provision that imposes trust obligations upon the defendant and imposes a trust " 'whose res encompasses the property at issue.' " *Perry v. Ichida (In re Ichida)*, 434 B.R. 852, 862 (Bankr.S.D.Ohio 2010) citing *Blaszak*, 397 F.3d at 391. Plaintiff can only succeed on its claim if it proves that there is an Ohio statutory provision that imposes trust-like obligations upon Debtors. For this purpose, Plaintiff cites Ohio Rev.Code §§ 1302.44(B), 4505.03, and 4505.04.

Upon review of the Ohio Rev. Code provisions cited by Plaintiff, it is apparent that those statutes do not place any trust like obligations upon Debtors. Ohio Rev. Code § 1302.44(B) recognizes a merchant's power to transfer all the rights to goods to a purchaser in the ordinary course, regardless of whether the merchant was entrusted with the goods by the party from whom the merchant acquired the goods. Ohio Rev.Code § 4505.03 prohibits the sale of a motor vehicle without delivering to the buyer a certificate of title for the motor vehicle showing title in the buyer. Ohio Rev.Code § 4505.04 governs evidence of ownership of a motor vehicle and prohibits the acquisition of any right, title, claim, or interest in a motor vehicle without a certificate of title. The above cited statutes do not place any trust like obligations upon Debtors or establish a trust *res*. Furthermore, Debtors were not personally nor actively involved in the transaction for the purchase of the Camry from Plaintiff, nor the sale of the Camry to Dr. Janicki. Debtors could not be acting in a fiduciary capacity for a transaction in which they were not involved. Therefore, Plaintiff has failed to establish that an express or technical trust existed either by agreement with the Plaintiff, or as the result of an Ohio statute. Plaintiff's cause of action under § 523(a)(4) must fail.

### 2. Plaintiff Has Not Demonstrated Embezzlement Under Section 523(a)(4).

Embezzlement is the " 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir.1996) (citing *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202 (Bankr.M.D.Tenn.1982)). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Brady*, 101 F.3d at 1173 (citing *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr.N.D.Ohio 1993)). The fraud element may also be satisfied by a showing of deceit. *See Imbody*, 104 B.R. at 841 (stating that "[m]ost courts that have considered the issue have held that acting with deceit will satisfy the fraudulent intent requirement" of embezzlement); *H.P. Marketing Corp. v. Mills (In re Mills)*, 210 B.R. 289, 292 (Bankr.N.D.Ohio 1996) (stating the third element of embezzlement is the use of "some form of fraud or deceit"). Each of these elements must be proven by a preponderance of the evidence. *Grogan*, 498 U.S. at 291, 111 S.Ct. 654 (holding that the standard of proof for the dischargeability exception in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard). While embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, it differs from larceny in that the original taking or possession of the

property is lawful, or with the consent of the owner. *See Moore v. U.S.*, 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895).

■ Plaintiff is unable to show that the elements of embezzlement under § 523(a)(4) exist. The Camry was not entrusted to Debtors. Plaintiff sold and delivered the Camry to FPL and expected to be paid in the normal course of business. Mr. Adcock made it clear that Plaintiff did not care what happened to the Camry after FPL purchased it. Plaintiff had no knowledge of FPL's intended use for the vehicle (i.e., its sale to Dr. Janicki). There is no evidence that Plaintiff expected FPL to merely hold the Camry until FPL paid Plaintiff for it, or that Plaintiff entrusted the vehicle for purposes of sale, expecting to be paid from sale proceeds. Furthermore, Plaintiff failed to establish any deceit upon the part of Debtors. Plaintiff adduced no evidence at trial from which the Court could infer that Debtors acted with deceit. Therefore, Plaintiff has failed to establish that the debt of FPL to Plaintiff, to the extent that Debtors would be held personally liable, is nondischargeable under § 523(a)(4).

### D. Plaintiff Has not Demonstrated Willful and Malicious Injury by the Debtor upon Plaintiff or Plaintiff's Property Under Section 523(a)(6).

Even if Plaintiff had shown that the Court should "pierce the corporate veil" of FPL so as to hold Debtors liable for the debt owed by FPL to Plaintiff, Plaintiff failed to prove the debt nondischargeable under § 523(a)(6) of the Bankruptcy Code. That section provides in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the Debtor to another entity or to the property of another entity....

■ Because the word "willful" in the statute modifies the word "injury," the United States Supreme Court has concluded that § 523(a)(6) requires a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). "[T]he actor must intend 'the consequences of an act,' not simply 'the act itself.'" *Id.* at 61–62, 118 S.Ct. 974 (emphasis in original) (citation omitted).

■ Willfulness is shown when it is demonstrated that the debtor either had a desire to cause the consequences of his act, or believed that injury was substantially certain to result from his conduct. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir.1999). *See also Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir.2001). The focus is on the debtor's state of mind. The fact that the debtor *should* have known the consequences of his actions is not sufficient to satisfy the requirements of willfulness. *Markowitz*, 190 F.3d at 465 n. 10. Similarly, damages arising from conduct which is reckless or negligent do not fall within the purview of § 523(a)(6). *Kawaauhau*, 523 U.S. at 59, 118 S.Ct. 974.

■ The requirement of maliciousness is met when it is demonstrated that (1) the debtor has committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily causes injury, and (4) there is no just cause or excuse for the action. *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228 (6th Cir.1991); *Jercich*, 238 F.3d at 1209.

■ Plaintiff posits that FPL willfully and maliciously caused injury to Plaintiff by converting the Camry, or in

the alternative, for converting the proceeds from the sale of the Camry, for FPL or Debtors' own use and benefit. Under Ohio law, conversion is "a wrongful exercise of dominion or control over property belonging to another, in denial of or under a claim inconsistent with his rights." *Bench Billboard Co. v. Columbus*, 63 Ohio App.3d 421, 428, 579 N.E.2d 240 (Ohio Ct.App.1989). Plaintiff alleges that Debtors converted the Camry or the proceeds from the sale of the Camry for its own use and benefit which caused injury to Plaintiff. Plaintiff insists that Debtors knew such failure to return the Camry or remit the proceeds from the sale of the Camry to Plaintiff would cause harm or injury to Plaintiff. Plaintiff further asserts that Debtors, as officers, directors and shareholder of FPL, are personally liable for the intentional torts of the corporation in which they actively participated and for which they received direct or indirect benefits.

The evidence presented at trial shows that FPL purchased the Camry from Plaintiff on account. Testimony was adduced at trial that FPL would normally purchase a vehicle from Plaintiff and then pay Plaintiff within 30–50 days. While Plaintiff may have withheld the MSO for the Camry, it was clear from the testimony of Mr. Adcock and Debtors that the intent of the sale transaction between Plaintiff and FPL was to give FPL the right to sell the Camry to another and pay Plaintiff in the normal course of FPL's business. Therefore, FPL's sale of the Camry to Dr. Janicki cannot be construed as a wrongful exercise of dominion and control over the Camry by FPL.

Moreover, Plaintiff provided no evidence that the proceeds from the sale of the Camry were Plaintiff's property. In fact, Mr. Adcock testified that Plaintiff did not care how it got paid. Rather, Plaintiff expected payment from FPL by whatever means FPL chose or had access to. Payment by FPL to Plaintiff was not contingent upon the sale of the Camry and Plaintiff did not retain a lien on the Camry or obtain a security interest in or an assignment of the proceeds from the sale of the Camry. Therefore, Plaintiff's theory that the proceeds from the sale of the Camry were Plaintiff's property is without merit.

Debtors testified credibly that they had no knowledge of the Camry sale transaction prior to closing FPL and Plaintiff failed to provide any evidence otherwise. Plaintiff has failed to prove that FPL converted Plaintiff's property or that Debtors actively participated in conversion of its property. Accordingly, the Court need not determine whether Debtors are personably liable as officers of FPL for conversion of Plaintiff's property. Because Plaintiff's cause of action under § 523(a)(6) relies upon conversion of its property to establish willful and malicious conduct on behalf of Debtors, and this Court finds that neither FPL nor Debtors converted Plaintiff's property, Plaintiff's cause of action under § 523(a)(6) fails.

### III.  Conclusion

Plaintiff has failed to show that the corporate veil should be disregarded and liability visited upon Debtors. Plaintiff has further failed to demonstrate that it is entitled to judgment under § 523(a)(2), (4), or (6). Because the Court has found in favor of Defendants on Counts I, II, and III of Plaintiff's Complaint, Plaintiff's Count IV for attorneys' fees is moot. Therefore, Debtors are entitled to judgment in their favor. A separate final judgment will be entered in accordance with the foregoing.

**IT IS SO ORDERED.**