**James P. FLOOD, Debtor.**

**CNA Financial Corp., Plaintiff.**

**v.**

**James P. Flood, Defendant.**

**Bankruptcy No. 11–61763.**
**Adversary No. 12–2228.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Sept. 20, 2013.

J. Matthew Fisher, Allen, Kuehnle Stovall & Neuman LLP, Columbus, OH, for Debtor/Defendant.

David C. Christian, Seyfarth Shaw LLP, Chicago, IL, for Plaintiff.

## MEMORANDUM OPINION AND ORDER REGARDING ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY (DOC. NO. 1)

CHARLES M. CALDWELL, Judge.

This Memorandum Opinion and Order serves as the Court's findings of fact and conclusions of law on the Complaint to Determine Dischargeability filed on behalf of CNA Financial Corporation ("Plaintiff") against the Debtor James P. Flood ("Defendant"). The dispute arises from a 1998 stock purchase and loan agreement offered by Plaintiff to senior executives, including the Defendant. The Defendant purchased 34,374 shares of Plaintiff's stock through a $1,200,000 loan extended by the Plaintiff, payable ten years later in 2008.

The Defendant failed to repay the loan, and this adversary proceeding was filed to except from the discharge the balance due, after providing full credit for the liquidation of the stock. The Plaintiff is suing under Sections 523(a)(2)(A) (fraud) and 523(a)(6) (willful and malicious injury) of the United States Bankruptcy Code ("Code"). Based upon the evidence, including credibility assessments, the Court finds and concludes that the Plaintiff has failed to sustain its burden of proof on all counts. The Court's reasoning and decision follows.

Defendant graduated from law school in 1977, and started his legal career as a staff attorney for Continental Insurance, an affiliate of the Plaintiff. In 1992, Defendant became Plaintiff's Senior Vice President for Claims, and was located in the Chicago area. Six years later, in 1998, to boost the value of Plaintiff's stock, it developed a program that allowed senior executives to purchase stock using funds borrowed from the Plaintiff. The Defendant testified that he understood the stock's value was projected to rise faster than the interest rate, and that senior executives would make enough money working for the Plaintiff to repay the loan over time.

To demonstrate loyalty to the Plaintiff, Defendant testified that he decided to participate in the stock purchase program. He was required to sign five documents: (1) a loan agreement, (2) a participation agreement, (3) a secured promissory note, (4) a pledge agreement, and (5) a collateral assignment and security agreement. These five loan documents, all together, stated that:

- Defendant understood the risks associated with purchasing stock, and had an opportunity to independently review the documents and receive answers to any questions;

- Defendant could not sell the stock for anything less than fair market value;
- Proceeds from sale of the stock would first fulfill any outstanding loan obligations;
- Defendant would provide any necessary documentation to ensure that the loan could be properly secured and recorded;
- Defendant would not give any other party a lien superior to the Plaintiff's lien;
- Defendant would pay any costs associated with collection upon default;
- Plaintiff retained possession of the stock until Defendant repaid the loan; and
- Repayment of the loan was not tied to Defendant's continued employment.

On October 9, 1998, the Defendant signed these documents and received a $1,200,000 loan for the purchase of 34,374 shares. The loan was payable in ten years, on October 9, 2008, with interest compounded semi-annually. The documents, however, failed to require any periodic payments prior to the due date of this $1,200,000 loan. Regarding insuring the financial ability of the Defendant to pay the loan, the documents only contained a general representation and warranty that at the time there were no pending legal proceedings that would impact Defendant's financial condition. Also, the Plaintiff did not obtain a financial statement from the Defendant, and no other collateral was pledged, except the stock.

Most significantly, the Plaintiff failed to provide testimony from any of its own employees that were around in 1998, and that negotiated and/or discussed the loan terms with the Defendant. The Court has only been provided the Defendant's recollection of this critical period, and for this reason does not know what if any representations the Plaintiff relied upon in ex-

tending such a substantial amount of credit to the Defendant. Indeed, the only other testimony presented by the Plaintiff are the depositions of an estate planner and attorney that counseled the Defendant some two years after the loan was closed.

According to the Defendant's testimony, at the time he took the loan and purchased the stock, he did not have any long-term strategy to repay, such as opening a separate repayment account or purchasing other financial instruments as a hedge. However, the Defendant testified that he believed his employment income was his only significant asset, and that between the stock value and his salary, he could repay the loan over time. At the time of the loan, there is no evidence that the Defendant sold or transferred assets, or took any other action to avoid repayment. Also, at the time of the loan, the Defendant held the title of Senior Vice President of Claims for the entire company, with an annual salary of approximately $700.000, plus participation in the Plaintiff's retirement plans.

Instead, Plaintiff primarily points to actions the Defendant and his wife, Dana Flood, took two years after the loan was made. Specifically, on March 15, 2000, they sought estate-planning advice from a financial advisor and an attorney, Messrs. Richard B. Weil and Charles Miller. The Defendant and his spouse completed a form that listed their assets and liabilities, and included the stock, but did not disclose the corresponding loan. In response, Defendant testified that if he disclosed information about his stock ownership, he would have concurrently provided information about the loan, but could not recall specific conversations. Further, Defendant explained that he sought estate-planning advice at that time to provide for his family in case of his early death, given family history.

In 2001, Plaintiff's leadership changed, and Defendant's employment was terminated, effective February 1, 2002. Plaintiff provided a $304,904.82 cash severance. Defendant also elected to take a lump sum payout from Plaintiff's Senior Executive Retirement Program. As a result, on March 4, 2002, Defendant received a post-tax payout of $906,269.29. According to the Defendant's testimony, when he learned that he would be terminated, he met with then-CEO Bernie Hengesbaugh, to discuss repayment of the loan. Defendant testified that Mr. Hengesbaugh told him to follow the obligations set out by the loan documents, and that anything less than full payment of the loan was unacceptable.

After his termination, Defendant testified that he did not know how long it would take to find a substantially similar position. As a result, subsequent to receiving the retirement payout and his severance package, Defendant and his spouse on March 8, 2002, paid $659,658.34 to satisfy the mortgage on their residence in Hinsdale, Illinois. Defendant testified that this was done to minimize monthly bills until he could find new employment. That same year of 2002, Defendant and his spouse also paid in full the loan on their Mercedes–Benz SUV.

During 2002, Defendant worked as an insurance arbitrator, and ultimately found a new position with Meadowbrook Insurance in late 2003. However, this new position was in Columbus, Ohio. As a result, the Defendant and his spouse sold the Hinsdale house and purchased land in Delaware, Ohio to build a new home in 2004. Unlike the Hinsdale property, the deed to the Ohio property was titled solely in the name of Defendant's spouse. However, the Defendant is on the mortgage, and he makes the payments. Altogether, the Defendant and his spouse spent approximately $1,000,000 on their new residence ($230,000 for the land and $800,000 in constructions costs). During this time, Defendant did not use any funds from his severance package, the lump-sum distribution of his retirement, any monies earned during his work as an arbitrator, or funds earned from the sale of the Hinsdale home, to repay any part of the outstanding loan.

Some four years later on August 2, 2007, Defendant sent an email to Jonathan D. Kantor, Plaintiff's general counsel. In the e-mail, Defendant stated that during a recent peak in the stock price, he was hopeful that a sale could satisfy the outstanding loan obligation. In response, Mr. Kantor told the Defendant to contact the Human Resources Department, and that many of the executive loans had been repaid. After this email, the Defendant testified that he attempted to negotiate with the Plaintiff to alter the repayment terms of the loan. However, on October 9, 2008, the loan came due without any term modifications or any payments.

On July 6, 2009, Plaintiff declared the loan in default. Next, on March 25, 2011, Plaintiff filed suit in Illinois state court, and on November 23, 2011, eight months later, the Defendant filed bankruptcy. On May 3, 2012, Plaintiff filed this adversary proceeding, requesting that the outstanding loan obligation be excepted from discharge under Sections 523(a)(2)(A) (fraud) and 523(a)(6) (willful and malicious injury) of the Code. The outstanding obligation totals $1,404,693.72, and includes accrued interest after Defendant surrendered the stock.

Plaintiff's theory is that the Defendant only intended to repay the loan if the stock value rose above the outstanding balance, and that he diverted assets to his wife as part of a scheme to avoid repaying. In response, Defendant asserts that at the time the loan was made, he intended to

repay, and that he never intended to harm his former employer. A discussion of the legal standards and the Court's conclusions follow.

■ Looking first at the criteria in finding a willful and malicious injury (11 U.S.C. § 523(a)(6)), the Plaintiff has the burden of proving, by a preponderance of the evidence, that at the time the action was taken, there was actual intent to cause injury, and mere negligence is not sufficient. *Cash America Financial Services, Inc. v. Fox (In re Fox)*, 370 B.R. 104, 119 (6th Cir. BAP 2007) *citing Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *HER, Inc. v. Barlow (In re Barlow)*, 478 B.R. 320, 329–32 (Bankr.S.D.Ohio 2012); *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Plaintiff failed to present any evidence that at the time the loan was executed, Defendant had any motivation to take the $1,200,000 loan and the stock in order to harm the Plaintiff. To the contrary, when the loan was made, the Defendant was a senior, highly paid executive, employed by the Plaintiff for many years. Like other senior executives, he participated in the stock purchase/loan program to demonstrate loyalty to the Plaintiff. The Defendant was not terminated until approximately 3 years later. The fact that he may not have had a definitive plan to pay the loan is not persuasive, since the Defendant had substantial income at the time of the loan and would not be required to pay anything for ten years. Further, at the time the loan was made, there was no attempt to sell or transfer assets to avoid repayment. It is true that the Defendant failed to pay anything on the loan, and spent considerable sums in relocating to Ohio. However; these are errors in judgment and a failure to abide by contractual terms. For these reasons, the Court finds and concludes that the Plaintiff has failed

to establish by a preponderance of the evidence that the Defendant acted willfully and maliciously to harm its interests at the time of the transaction.

Moving next to the Plaintiff's fraud count (11 U.S.C. § 523(a)(2)(A)), the Plaintiff must prove by a preponderance of the evidence four components, including that: **(1)** Defendant obtained money through false pretenses, false representation, or actual fraud; **(2)** Defendant intended to deceive the Plaintiff; **(3)** Plaintiff justifiably relied on the false representation or fraud; and **(4)** Plaintiff's reliance was the proximate cause of the loss. 11 U.S.C. § 523(a)(2)(A); *see also Coughlin Chevrolet, Inc. v. Thompson (In re Thompson)*, 458 B.R. 409, 420–21 (Bankr.S.D.Ohio 2011) (citing *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir.1998) (detailing the elements of fraud-based non-dischargeability action)). The Court will separately discuss these factors.

■ First, a false pretense is an implied misrepresentation or conduct that is intended to create or foster a false impression. *Germain Lincoln Mercury of Columbus, Inc. v. Begun (In re Begun)*, 136 B.R. 490, 494 (Bankr.S.D.Ohio 1992). A false representation is an express, misrepresentation. *Beverly Enterprises v. Eversole (In re Eversole)*, 110 B.R. 318–24 (Bankr.S.D.Ohio 1990). Finally, fraud is a statement or act done to deceive. *Merchants National Bank v. Moen (In re Moen)*, 238 B.R. 785, 790–91 (8th Cir. BAP 1999).

■ Turning to the facts in this case, by signing the loan documents the Defendant promised: **(1)** not to sell the stock for less than fair value; **(2)** to repay the loan by October 9, 2008; **(3)** to deliver any necessary documents to the Plaintiff for security and recordation of the loan; **(4)** that he understood the risks associated with the

loan; (5) that he would not encumber the collateral with a superior lien; (6) that Plaintiff would receive a first lien on the stock; and (7) that he would pay for attorney fees and expenses incurred to collect. Defendant credibly testified that he understood all of these promises, and that he did not lie or misrepresent his circumstances to the Plaintiff. In addition, Plaintiff did not present any evidence that the Defendant lied or failed to correct any error when he signed the loan documents.

■ Second, the intent to deceive must have existed at the time of the loan transaction. *See Rembert,* 141 F.3d at 280 ("the debtor obtained money through a material misrepresentation that, *at the time,* the debtor knew was false or made with gross recklessness as to its truth") (emphasis added). As defendants are unlikely to admit they intended to deceive, their intent may be inferred from the totality of the circumstances. *Liberty Savings Bank, FSB v. McClintic (In re McClintic),* 383 B.R. 689, 693 (Bankr. S.D.Ohio 2008). As circumstantial evidence of intent to deceive, courts may consider conduct after the obligation is incurred. *Williams v. Logan (In re Logan),* 313 B.R. 745, 749 (Bankr.S.D.Ohio 2004); *see also McClintic,* 383 B.R. at 693; *Siebanoller v. Rahrig (In re Rahrig),* 373 B.R. 829, 834 (Bankr.N.D.Ohio 2007).

Plaintiff presented primarily four pieces of circumstantial evidence it claims demonstrates Defendant's fraudulent intent: (1) Defendant did not make any payments over the ten year loan period; (2) Defendant did not have any plans to counter any losses due to the stock price decreasing; (3) Defendant titled marital assets solely in his spouse's name and engaged in estate planning; and (4) Defendant paid other debts instead of the loan obligation. In response, Defendant contends that any circumstantial evidence that indicates fraudulent intent occurred long after the loan

was made. Further, Defendant claims there is an innocent explanation for Defendant's behavior—he acted out of a desire to provide for his family.

Looking at the facts in this case, the Defendant testified that when he signed the loan documents, he was a long term employee of the Plaintiff, had every expectation of continuing to work for the Plaintiff, and expected to pay the loan obligation with his salary, over time. The Court finds the Defendant's testimony credible on these points. The circumstantial evidence Plaintiff identifies as indicative of fraudulent intent; e.g. paying off the Hinsdale mortgage and the Mercedes SUV, omitting himself from the title on the Ohio house, and not paying anything on the loan, all took place years after the loan was executed. To the contrary, there is no evidence that at the time of the loan the Defendant transferred assets or took other steps to stall recovery by the Plaintiff. The single event that could have supplied motive, Defendant's termination, did not take place until 2002.

■ Finally, Plaintiff must prove that it justifiably relied on a fraudulent act, fraudulent statement, or misrepresentation by the Defendant, and that this reliance was the proximate cause of the loss. *Field v. Mans,* 516 U.S. 59, 67–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *First Horizon Home Loan Corp., et al. v. Apostle (In re Apostle),* 467 B.R. 433, 443–44 (Bankr.W.D.Mich.2012). In this case, the loan documents are only evidence of the promises Defendant made. Further, as expressed earlier, the Plaintiff failed to provide testimony from any of its own employees around at the time, regarding what if any of these promises were actually relied upon in the lending decision. Instead, the record before the Court shows that the Plaintiff created a stock purchase/loan program to boost its stock

price. This program was offered to senior executives, like the Defendant, who were highly paid and could be relied upon, given their position in the company and salary level, to repay the loans. Without any testimony from the Plaintiff to the contrary, the only logical conclusion is that the Plaintiff relied upon these characteristics and circumstances, rather than any express or implied representations or misrepresentations of the Defendant, and that the Defendant was not the proximate cause of the loss.

In sum, the Court finds and concludes that this is not a case of fraud or willful and malicious injury, and but for the large sums involved, is like many other breach of contract cases that occur for a variety of reasons that have nothing to do with fraud and/or the desire to harm. Rather, the Court finds and concludes that this is a case of unanticipated events that took place after the loan (primarily the loss of a job that paid $700,000 per year). This situation was exacerbated by the foolhardy construction of million dollar home, after the Defendant found a new job in Ohio making substantially less. On the other hand, the Plaintiff blithely increased its exposure by loaning $1,200,000 for ten years on a speculative asset, without any requirement for periodic payments along the way. Further, to make matters worse, Plaintiff fires the Defendant, but on the way out the door, hands over large sums of money with requiring repayment of the loan. This is not fraud and/or willful and malicious injury, but rather a recipe for financial ruin of both the Plaintiff and the Defendant.

For these reasons the Defendant's obligation to Plaintiff is **DISCHARGED.**

**IT IS SO ORDERED.**