In re Jeffrey E. WILLIAMS, Rhonda Renee Williams, Debtor(s).

Smart Financial Credit Union, Plaintiff(s)

v.

Jeffrey E. Williams, Rhonda Renee Williams, Defendant(s).

Bankruptcy No. 09–32569.
Adversary No. 09–3286.

United States Bankruptcy Court, S.D. Texas, Houston Division.

Oct. 7, 2011.

Don Joseph Knabeschuh, Attorney at Law, James D. Cupples, Williams Cupples Chapman LLP, Houston, TX, for Plaintiff.

William Britton Hall, Rigby Owen, III, Attorney at Law, a PLLC, Conroe, TX, for Defendants.

## ORDER REGARDING COMPLAINT TO DETERMINE DISCHARGE-ABILITY

KAREN K. BROWN, Bankruptcy Judge.

### I. Issues at trial and Resolution

Before the Court is the amended complaint of Smart Financial Credit Union (Smart), objecting to the dischargeability of its debt under 11 U.S.C. § 523(a)(2)(A)(false pretenses, a false representation, or actual fraud); § 523(a)(2)(c) (cash advances were obtained in an amount aggregating more than $750 within 70 days before the order for relief) [1] and § 523(a)(6) (willful and malicious injury to the credit union or its property). Plaintiff also contends that debtors filed their petition in bad faith in violation of 11 U.S.C. § 1325 and seek attorneys fees under Tex. Civ. Prac. & Rem.Code Sec. 134.002(2) et seq.

Federal Insurance Company reimbursed Smart for its losses related to Jeffrey Williams' account and Smart assigned all its claims to Federal. Federal (Federal/Smart) sued Jeffrey Williams in Texas state court for breach of a contract. Five months later, Debtors filed bankruptcy. Now, on behalf of its subrogor, Federal seeks a nondischargeable judgment of $144,764.35 against both Jeffrey and Rhonda Williams.

The Williams deny they committed fraud or ever intended to maliciously injure Smart. Moreover, they deny filing their bankruptcy in bad faith, pointing to their numerous financial problems that they seek to resolve in a Chapter 13 plan. In addition, Debtors raise numerous defenses: including laches and waiver and estoppel. Debtors deny that Smart is entitled to its attorneys fees.

This court has jurisdiction over this adversary pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157. This is a core proceeding.

After reviewing the trial exhibits and observing the witnesses, the Court finds that Federal on behalf of Smart has failed to carry its burden of proof by a preponderance of the evidence on any of its allegations. Consequently, the motion to dismiss is denied, the debtors are allowed their discharge on completion of their Chapter 13 plan. Federal is denied its attorneys fees.

### II. Facts

Jeffrey Williams is a fire fighter in Conroe, Texas and works part-time as a fire investigator for Montgomery County, Texas. Rhonda Williams is a substitute teacher in the Conroe Independent School District. They married in 2004. After their marriage, Mrs. Williams handled most of their finances.

In 1994 Jeffrey Williams opened a checking and savings account with what was then named First Educators Credit Union (First Educators).[2] Through the

---

1. Plaintiff abandoned this allegation at trial.

2. First Educators Credit Union is now known as Smart Financial Credit Union.

years, he has had several loans with First Educators. Smart agrees that Jeffrey Williams repaid his loans for nine years and is a man of "repute" in the community.

On August 20, 1999, Jeffrey Williams signed a Loanliner Disbursement Voucher and Security Agreement, a single page document, establishing a line of credit with a loan limit of $3,000 with First Educators. The agreement sets out that the line of credit has an annual percentage rate of 10.90% and requires a payment of $35.00 monthly after an advance.

Thereafter, on July 25, 2002, Jeffrey Williams signed another agreement with First Educators Credit Union entitled "Loanliner Open–End Plan Signatures PLUS." That document states:

> This LOANLINER Credit and Security Agreement . . . will be referred to as the Plan. The Plan documents include this agreement and an Addendum . . .
>
> 1. HOW THIS PLAN WORKS—This is an open-end, multi-featured credit plan. We anticipate that, from time to time, you will borrow money (called "advances") under the Plan. We are not required to make advances to you under the plan and can refuse a request for an advance at any time. The Addendum describes the different types of credit (called "subaccounts") available under the Plan, the current interest rate for each subaccount expressed as a daily periodic rate and corresponding annual percentage rate and other charges. It may also have other terms and a schedule for determining payment amounts.
>
> 2. CREDIT LIMIT—We may, but do not have to, establish a credit limit on certain subaccounts. If a credit limit is set for a subaccount, you promise not to exceed the established credit limit. If you exceed the credit limit, you promise to repay immediately the amount which exceeds the credit limit.

> 3. REPAYMENT—You promise to repay all amounts you owe under the Plan plus Interest. Payments are due on the last day of the month unless we set a different day at the time of an advance. If the Addendum has no payment schedule for a subaccount, your payment will be determined at the time of each advance. Payments must include any amount past due and any amount by which you have exceeded any credit limit you have been given for a subaccount. You may repay all or part of what you owe at any time without any prepayment penalty. Even if you prepay, you will still be required to make the regularly scheduled payments unless we agree in writing to a change in the payment schedule. If you have a joint share draft account, you will be responsible for paying all overdraft advances obtained by a joint holder of the share draft account. Unless otherwise required by law, payments will be applied to amounts owed under the Plan, In the manner the Credit Union chooses.
>
> 4. PLAN ACCESS—You can obtain credit advances in any manner authorized by us. If we allow you to use your ATM/Debit card to access the Plan, you may be liable for the unauthorized use of your ATM/Debit card. You will not be liable for unauthorized use that occurs after you notify us, orally or in writing, of the loss, theft, or possible unauthorized use. If you believe your ATM/Debit card has been lost or stolen, immediately inform the Credit Union by calling or writing us at the telephone number or address that appears elsewhere in the Plan. If the card is used to obtain unauthorized advances directly from the Plan, your liability will not exceed $50. If the unauthorized withdrawal is from a share draft account, your liability is governed by the Regulation E disclosures

you received at the time you received your ATM/Debit card, even if the withdrawal results in an advance being made from your overdraft subaccount.

. . .

8. PERIODIC STATEMENT—On a regular basis you will receive a statement showing all transactions under the Plan during the period covered by the statement, Statements and notices will be sent to you at the most recent address you have given us in writing. Unless applicable law requires notice to each joint borrower, notice to any one of you will be notice to all.

. . .

The following paragraph applies to borrowers in all other states: We have the right to change forms of the Plan from time to time after giving you any advance notice required by law. Any change in the interest rate will apply to future advances, and at our discretion and subject to any requirements of applicable law, will also apply to unpaid balances.

From 1999 to 2004, Mr. Williams paid as agreed. However, during the summer of 2005, he failed to timely make two or more of the minimum monthly payments due on the account. In August 2005, Jeffrey Williams, at Rhonda Williams' request, set up a payroll deduction plan through his employer, the City of Conroe, to pay Smart Financial $50.00 per bi-weekly pay period. These Case 09–03286 Document 47 Filed in TXSB on 10/07/11 Page 5 of 16 payments continued until October 2008 when Smart closed the account and refused to accept any more payments.

In 2005 with her husband's permission, Rhonda Williams began using the account by ATM withdrawals. Following its Loanliner Agreement with Jeffrey Williams,

Smart mailed written monthly statements to Jeffrey Williams.[3]

Until August 2005, each monthly, written account statement Smart mailed to Jeffrey Williams, showed his line of credit restricted to $3,000.00. However, in September 2005 and for three years thereafter, Smart's account records show no credit limit on this account.

For example, Jeffrey Williams's August 2005 account statement reads:

Your balance at the beginning of the period . . . $2,998.58 . . . Your new balance on 31AUG05 . . . $2998.58 . . . Loan limit $3000.00, your available credit is $1.42.

Conversely, Williams' September 2005 account statement shows no loan limit or the amount of available credit. Specifically, Smart's September 2005 statement tells Jeffrey Williams:

Your balance at the beginning of the period . . . 2998.58 . . . Your new balance on 30SEP05 . . . $2857.98.

Loretta Wolsey, Vice President of Risk Management and Compliance for Smart testified that Mr. Williams' line of credit account had a credit limit of $3,000 until it was rescinded in 2005. The account was supposed to be closed. Instead, Smart continued the Jeffrey Williams account, along with those of 160 other customers accounts and gave all 161 customers unlimited credit.

Wolsey testified that her records showed that on September 8, 2005, Smart mailed a letter (Plaintiff's Exhibit 2) to Jeffrey Williams at his mobile home address, 27488 Denn Road, Montgomery, Texas 77356, notifying him that Smart was rescinding his line of credit because he had not paid as agreed. Both Jeffrey and Rhonda Williams testified that, during this

3. Debtors were not signed up on line to re-

ceive their account information online.

time, Smart never told them in any manner that their line of credit account was rescinded. They never saw Smart's letter until trial. From observing their demeanor and reviewing Smart's own evidence, the Court finds their testimony credible. The Court finds that the Williams never received notice that the account was closed. Moreover, according to Smart's own records, the September, October, November and December 2005 account statements Smart mailed to Jeffrey Williams showed that the Loanliner account was not only open, but had unlimited credit.

For over three years, Smart never closed Jeffrey Williams' account; it never stopped lending money to him or accepting payments from him until September 23, 2008. To all appearances Smart's actions indicated to the Williams that the Loanliner account was open and had unlimited credit. Moreover, Smart stopped mailing statements to its customers after December 2008 and made account statements only available to its customers on line. Jeffrey Williams was not enrolled to receive the statements on line. Consequently, there were no regularly mailed statements to Mr. Williams even though the Loanliner Agreement required Smart to mail them to customers.

This Court finds that Smart kept Mr. Williams' account open without giving him notice of rescission or any notice that he had exceeded his limit of credit. Moreover, the Court after observing the debtors' testimony, concludes that they were unaware of the total balance on this account. Smart failed to prove that the Williams knew about the increasing balance on this account over the three years they continued to pay on and borrow from the account.

Mrs. Wolsey, testified that, prior to on-line banking, depositors used checks to draw directly on their lines of credit accounts. To obtain an advance, customers were required either to come to the branch office or to call the office to have money transferred. An employee would review the account to determine whether the customer had available credit. If the account information showed that there was an unlimited amount of credit or that no credit was available, the employee would not make the requested transfer. At trial Wolsey agreed that had the former system been in place after 2005, Smart would have prevented such problems from happening.

In 2006, Smart selected a new vendor for its core data processor. On July 2, 2006, Smart converted from its old computer software system to a new one. However, for two years Smart failed to discover that it was incorrectly operating its new system. Prior to the new software installation, whenever Smart rescinded lines of credit or when a customer had no more credit available, Smart's instructions to its staff were to leave the credit limit field blank. Its staff would make no entry in the data field, showing no credit was available. However, when it installed its new software, Smart's practice of making no entry in the credit limit field, indicated that the customers had no credit limit. Smart would then continue to make loans to its customers so long as regular payments were made on the account.

On discovering its problem, Smart consulted the software vendor which explained, Smart must correct its practices and have its staff type actual numbers into the credit limit field in its database.

From 2005 to 2008, Smart provided unlimited credit to 161 of its customers, including Jeffrey Williams. Smart admits that it stopped mailing statements to Mr. Williams and never told him there was a problem with his account until September 2008.

In the years between 2005 to 2008, Smart was audited by regulators numerous times. In addition in April 2008, it installed a risk tracker program called "Bank Detect" to identify unusual customer transactions. However, Smart never adjusted this system to track customer transfers among their own accounts, because, as Mrs. Wolsey explained, there is no fraud associated with internally transferring funds between a customer's own accounts.

In September 2008, Hurricane Ike caused Smart to shut down Bank Detect system. When services were restored, the risk management department ran reports to review every transaction that had occurred the previous week. When Smart reset its system to identify deposits over $5,000 into borrowers' accounts, a report identified a $5,000 deposit made to Jeffrey Williams' account. Thereafter, Smart investigated and discovered that not only had it failed to close the Williams account, but that the account had a $133,000 balance on what Smart's records showed should have been a $3,000 line of credit.

Subsequently, Wolsey has instructed her analysts to review internal account transfers. This change in policy was not prompted by the events surrounding the 161 account errors. Instead the change in policy was due to an unrelated incident involving a relative or fiduciary of another account holder transferring money from the account holder to themselves.

In October 2008, Wolsey informed Jeffrey Williams that he owed over $133,000.00. Wolsey testified that Mr. Williams was shocked and could not speak at first. At all times Smart refused to speak to Mrs. Williams about the account because her name was not on the account.

In December, 2008, Smart sued Jeffrey Williams in state court for breach of contract. On April 14, 2009, debtors filed their chapter 13 bankruptcy. Smart filed a proof of claim in the amount of $144,764.35. Smart is the only objecting creditor. The Chapter 13 Trustee has reviewed the plan and recommends confirmation of debtors' plan.

III. Nondischargeable Fraud

Bankruptcy Code § 523 states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . .

■ The Supreme Court recognizes, that the exceptions to discharge are to be interpreted in favor of the debtor, but also are intended to protect victims of fraud. See *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (discussing the limits of the bankruptcy code's "fresh start" policy); *In re Allison*, 960 F.2d 481 (5th Cir.1992).

■ In *RecoverEdge v. Pentecost*, 44 F.3d 1284, 1292–1293 (5th Cir.1995), the Fifth Circuit stated the test for determining nondischargeability under § 523(a)(2)(A):

In order for a debtor's representation to be a "false representation or false pretense" under § 523(a)(2), it "must have been: (1) [a] knowing and fraudulent falsehood [ ], (2) describing past or current facts, (3) that [was] relied upon by the other party." *In re Allison*, 960 F.2d at 483; see also *In re Bercier*, 934 F.2d [689] at 692 [ (1991) ] ("[T]o be a false representation or false pretense under

§ 523(a)(2), the 'false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts.' " (quoting *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr.W.D.Ky.1986))).

. . . .

In order to prove nondischargeability under an actual fraud theory, the objecting creditor must prove that: "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations." *In re Roeder*, 61 B.R. at 181, quoted in *In re Bercier*, 934 F.2d at 692.

*RecoverEdge v. Pentecost*, 44 F.3d 1284, 1292–1293 (5th Cir.1995)

### A. False representation

█▆▟ Thus, the first question for this court is whether the debtors made any representations to the Plaintiff by commission or omission. Smart concedes that Jeffrey E. Williams made no representations to it at all. Instead, Smart alleges that Mrs. Williams made omissions of material facts to Smart by not telling Smart about its computer system errors. Smart characterizes Mrs. Williams' failure to inform Smart about its own defective data system as fraud. Smart also contends that Mr. Williams is vicariously responsible for his wife's fraudulent omissions because he gave her access to his account.

Smart fails to show any actual representation by Rhonda Williams; this is especially true in light of its refusal to speak with her about the account at issue. Although Smart does not contend that Mrs. Williams made implied representations to

it, by virtue of borrowing on the line of credit, the issue of implied representation is appropriate for this Court to consider. The Fifth Circuit addressed this issue in *In re Mercer*, 246 F.3d 391 (5th Cir.2001) In *Mercer*, the en banc Court found that each use of the credit card issued by the creditor to the debtor constituted a representation that she would repay the debt. Since the court found that debtor had no intention to repay the balance on the credit card at the time of the purchases, debtor's use of the credit card equaled a false representation. Unlike the facts in *Mercer*, the creditor here has never shown that the Rhonda Williams ever knew the account balance or that the Williams failed to make payments on the account. Moreover, given all the evidence and credible testimony of the Williams', Smart has failed to prove that Rhonda Williams made an implied false representation to it.

More importantly, Smart never knew that any of the overdrafts by 161 of its customers were actually happening, because of its misuse of its new software. None of these customers made any representation to Smart.

▌ The Fifth Circuit in *In re Acosta* 406 F.3d 367 (2005) considered a similar case to the Williams:

> Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963 F.2d 809, 813 (5th Cir.1992). An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *In re Norris*, 70 F.3d 27, 30 n. 12 (5th Cir.1995), citing *In re Miller*, 39 F.3d 301, 305 (11th Cir.1994). Nevertheless, an honest belief, even if unrea-

sonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive. *Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir.1997). Thus, a "dumb but honest" defendant does not have scienter. Id., citing 2 F. Harper, et al., Law of Torts § 7.3, at 393 (2d Ed. 1986).

*In re Acosta,* 406 F.3d 367 (2005)

Observing the Williams' testify, this Court finds that, at worse, they fit the *Acosta* standard of lack of intent. They had no intent to deceive Smart.

As for Jeffrey Williams, Wolsey testified that she believes that until she told him in October 2008, Mr. Williams had no knowledge that his line of credit balance was over $133,00.[4] Smart has not shown that Jeffrey Williams was involved in the loan transfers and withdrawals at all. In *Allison,* the Fifth Circuit found that a spouse who was wholly uninvolved and uninformed about the transactions alleged to be fraudulent should not be bound by the actions of the other spouse. Smart cannot rely on Mr. Williams receiving actual notice by virtue of monthly mailings to the Williams home, because Smart stopped giving such notice in 2006.

### B. Justifiable Reliance

Smart contends that it relied on "Rhonda Williams' multiple concealment of material fact and changed its position in reliance on her failure to advise it that the line of credit was inadvertently left open and without a limit." In addition, Smart Financial contends that false representations, fraud and willful and malicious injury inflicted by Rhonda Williams may be imputed to Defendant Jeffrey E. Williams.

The Supreme Court in *Field v. Mans* 516 U.S. 59, 71–72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) held:

"Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id., § 545 A, Comment b. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is

"required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."

*Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)

Smart's banking errors resulted in 161 accounts of customers who had overdrawn their credit limits. By Smart's logic each of these customers committed fraud at the time of each withdrawal by not discovering the software errors and reporting them to Smart. The difference between these customers and the Williams is the amount of the account. Another customer had overdrafts of $45,000; but is apparently attempting to repay Smart outside of bankruptcy. Fraud is determined at the time of each transaction, not later when a debtor decides to file bankruptcy.

Smart possessed all the Williams' account information. Smart knew each time Mrs. Williams made ATM or on line withdrawals. These "red flags" were in Smart's own records. Smart's disregard of its own records is not justifiable reliance.

---

**4.** Neither Jeffrey or Rhonda Williams has any financial education or financial sophistica-

tion.

### C. Proximate Cause

Assuming Smart could succeed regarding the other elements of § 523(a)(2)(b), Smart must still prove by a preponderance of the evidence that such representations proximately caused its loss under 11 U.S.C. § 523(a)(2)(A). *See also In re Allison,* 960 F.2d 481; *First Bank v. Eaton,* 41 B.R. 800 (Bankr.E.D.Wis.1984); *In re Peter W. Bassil,* 349 B.R. 475 (Bankr.E.D.La.2006); *In re McClintic,* 383 B.R. 689 (Bankr.S.D.Ohio 2008).

Another banking transaction that parallels the one at bar, arose in *In re Bumgarner,* 402 B.R. 374 (Bankr.M.D.Fla.2007). In *Bumgarner* a lender granted debtors a line of credit to be secured by their equity in real property, but failed to close an earlier line of credit. Ultimately, the lender loaned debtors a sum which far exceeded their equity in the property. The Court concluded that the lender failed to satisfy its burden to show that in continuing to extend credit on this earlier line of credit had relied on any false statement by debtors, or assuming, such statement that any reliance was justifiable.

Moreover, Smart Financial alleges that it "changed its position in reliance on [Rhonda Williams'] failure to advise it that the line of credit was inadvertently left open and without a limit." Smart Financial has failed to produce evidence showing how it changed its position in reliance on the silence of one who was not an account holder and with whom it refused to communicate. Indeed, Smart Financial has not explained how Rhonda Williams could have "advise[d] it that the line of credit was inadvertently left open and without a limit," since it would not communicate with her about the account.

Smart made its computer mistakes without regard to any actions taken by the Williams or other customers. The credit union's software conversion and subsequent failure to identify account activity in accounts it had previously closed allowed debtors and other customers to use their lines of credit without restriction. Smart Financial has failed to prove that debtors knew about the balance or did not intend to repay the funds. The evidence shows to the contrary that debtors continued to pay the line of credit monthly until prevented from doing so by the freeze on Jeffrey Williams' accounts. The Court finds that debtors' use of the line of credit was not fraud.

### IV. Malicious intent to harm

Smart alleges that Rhonda Williams's actions were substantially certain to result in injury to Smart Financial and that her subjective intent was to inflict a willful and malicious injury to Smart Financial.

Bankruptcy Code 11 U.S.C. § 523 states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(2)(A), and (a)(6).

The Fifth Circuit explained § 523(a)(6) in *In re Keaty,* 397 F.3d 264, 270 (5th Cir.2005):

> The Supreme Court, in *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), stated that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." The Fifth Circuit extended Kawaauhau's rea-

soning in *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998), and stated that "either objective substantial certainty [of injury] or subjective motive [to injure] meets the Supreme Court's definition of 'willful ... injury' in § 523(a)(6)." (third alteration in original). The court in Miller went on to define the word "malicious" and specifically rejected that it meant an act without just cause or excuse. *Id.* at 605. Instead, the court defined "malicious" as an act done with the actual intent to cause injury. *Id.* at 606. The court noted that this definition is synonymous with the definition of "willful" and thus aggregated "willful and malicious" into a unitary concept. Thus, the court held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Id.* at 606; see also *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003).

To prevail under § 523(a)(6), a creditor must prove by a preponderance of the evidence that the debt is not dischargeable. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005).

■ The Court finds that Smart has failed to prove that the Williams intended to willfully or maliciously injure Smart.

## V. GOOD FAITH FILING

■ Finally, Smart contends debtors have violated the standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.

Bankruptcy Code § 1325(a)(3) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . .

(3) the plan has been proposed in good faith and not by any means forbidden by law;

. . . .

11 U.S.C. § 1325(a)(3).

Smart contends that the Williams filed bankruptcy in bad faith to avoid its breach of contract suit filed in state court against Jeffrey Williams. The state law suit, even if successful, would only have created a judgment for breach of contract against Mr. Williams, in other words, an unsecured debt. That debt would have been dischargeable in bankruptcy. Moreover, the bankruptcy was filed almost five months later. The Williams testified that they filed bankruptcy because they could no longer keep current with their secured and unsecured bills. This Court credits their testimony.

The Court finds that debtor's Chapter 13 Bankruptcy Petition filed on April 14, 2009, by Jeffrey Williams and Rhonda Williams was filed in good faith.

The Court finds that Smart Financial Credit Union has failed to prove a cause of action under 11 U.S.C. § 523(a)(2)(A), (a)(6), or 11 U.S.C. § 1325(a)(3). Consequently, it is unnecessary to consider debtors' affirmative defenses.

**ORDERED** that, upon completion of their plan, the debt of Jeffrey and Rhonda Williams to Smart Financial Credit Union in the amount of $144,764.35, is to be **DISCHARGED** and debtors' plan is confirmed.